## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| PINNACLE PEAK PRIVATE CLIENT | : | |
| GROUP, LLC, | : | CIVIL ACTION |
| | : | FILE NO. 1:21-mi-99999 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KEYSTONE CAPITAL PARTNERS, INC., | : | |
| FEDERAL EMPLOYEE RETIREMENT | : | |
| COUNSELORS, INC., | : | |
| CHRISTOPHER SCOTT LAWS, and | : | |
| JONATHAN DAX COOKE, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT

COMES NOW, Pinnacle Peak Private Client Group, LLC, (hereinafter, "Plaintiff"), and files this, its Complaint for damages, and respectfully shows this Court the following:

### THE PARTIES

1.

Plaintiff is an Arizona limited liability company with its principal place of business in Scottsdale, Arizona. All of the members of Plaintiff are Arizona citizens.

2.

Defendant Keystone Capital Partners, Inc. ("Keystone") is a Georgia corporation with its principal place of business listed with the Georgia Secretary of State located at 100 North Point Center East, Suite 440, Alpharetta, Georgia 30022, located in Fulton County.

3.

Defendant Federal Employee Retirement Counselors, Inc. ("FERC") is a Georgia corporation with its principal place of business listed with the Georgia Secretary of State located at 100 North Point Center East, Suite 440, Alpharetta, Georgia 30022, located in Fulton County.

4.

Defendant Christopher Scott Laws ("Laws") is a Georgia citizen, and may be served at his last known residence, located at 420 The Hermitage Drive, Alpharetta, Georgia 30004.

5.

Defendant Jonathan Dax Cooke ("Cooke") is a Florida citizen, and may be served at his last known residence, located at 223 S. Shore Drive, Miramar Beach, Florida 32550.

## JURISDICTION AND VENUE

6.

This Court has original jurisdiction under 28 U.S.C. § 1332, in that there is diversity of citizenship between the parties and the amount in controversy exceeds seventy five thousand dollars.

7.

Venue is proper under 28 U.S.C. § 1391(a) and (c), as a substantial part of the events or omissions giving rise to the claim occurred in the judicial district of this Court.

8.

Defendants are subject to the jurisdiction and venue of this Court.

## FACTUAL BACKGROUND

9.

Plaintiff seeks damages against the Defendants in excess of $2,000,000 for material breach of representations and warranties contained in the August 26, 2016 Agreement for Purchase and Sale of Practice executed among the parties (the "Agreement"). The Agreement concerned the sale of a financial planning practice known as Federal Employee Benefit Counselors / Federal Employee Retirement Counselors (the "Business").

10.

The "Seller" of the Business was defined to collectively be Keystone, FERC, Laws in his individual capacity, and Cooke in his individual capacity. Laws and Cooke were equal owners of Keystone and FERC.

11.

In Section 3 of the Agreement, Defendants represented in their individual and corporate capacity:

> **d.     No claims, actions, suits, proceedings, or investigations are pending against or affect the Assets, at law or in equity, before or by any governmental agency or judicial forum; and Seller is not operating under, or subject to, nor is he/ in default with respect to any order, writ, injunction or decree or any court or governmental agency.**
>
> **e.     There is no fact or information presently known to Seller, which has not been disclosed to Buyer and which materially affects, or will materially affect, the Assets or Seller's ability to make the transfer contemplated herein.**

12.

In fact, Defendants were under investigation with the Securities and Exchange Commission (the "Commission") for quite some time before execution of the Agreement in August 2016 – and during the subsequent time until closing in January 2017.

13.

Less than 10 days before execution of the Agreement, by letter dated August 15, 2016, the Commission notified the Defendants that it made a preliminary

determination to recommend filing an enforcement action for fraudulent activities resulting in violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder (among others), and offered the Defendants to make a Wells Submission regarding the "Assets" covered by the Agreement and ultimately conveyed at closing (the "August 15, 2016 Wells Notice"). See Exhibit A, attached hereto.

14.

Defendant then retained Greenberg Traurig, LLP to defend them regarding this investigation, and submitted a Wells Submission to the Commission less than 10 days before closing – on December 30, 2016 – as referenced in a February 9, 2017 letter to the Commission. See Exhibits B and C, attached hereto.

15.

The closing for the transaction regarding the Agreement among the parties hereto occurred on January 10, 2017 (the "Closing").

16.

The Commission's investigation of the Defendants was neither disclosed to Plaintiff, nor available in the public domain prior to the Closing.

## CLAIM – BREACH OF CONTRACT

### 17.

The failure to disclose the Commission's investigation was a material breach of the representations contained in Section 3 of the Agreement, which survived the Closing according to Section 16 of the Agreement.

### 18.

The Commission in fact filed an enforcement action against the Defendants in July 2017. *SEC v. Keystone Capital Partners, Inc. d/b/a Federal Employee Benefit Counselors, Christopher S. Laws, Jonathan Dax Cooke, Danny S. Hood, and Brandon Long*, USDC NDGA Case No. 1:17-cv-02873 (the "SEC Litigation").

### 19.

Judgments have been entered against Mssrs. Laws, Hood, and Long, with the remaining parties waiting to be scheduled for a jury trial.

### 20.

Plaintiff first became aware of the Commission's investigation in March 2017 – two months after the Closing – and the resulting consequences were swift and severe.

21.

The Wells Notice was only discovered during a routine branch examination of Plaintiff's broker-dealer – BCG Securities – who then then terminated its relationship with Plaintiff's Atlanta office.

22.

Plaintiff was then required to change its broker-dealer, its name, its logo, and further make certain disclosures on its website and business documents. In addition, Plaintiff lost a significant amount of business from existing clients, despite great effort to mitigate the situation. The pendency of the SEC litigation had a material impact against sales with potential new clients.

23.

The net result being, given the reduced performance of the Assets conveyed in connection with the Agreement and the Closing over the last four years, Plaintiff suffered actual and consequential damages in an amount to be determined at trial, but in no event less than $2,000,000.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for the following relief:

a.      that summons and process issue in terms of law;

b.      that Plaintiff have judgment against the Defendants for its actual and consequential damages incurred;

c.     that Plaintiff have judgment against Defendants for its expenses of

litigation, including a reasonable sum as attorney's fees;

d.     that this case be tried before a jury;

e.     that all costs of this action be cast against Defendants;  and

f.     that Plaintiff be granted such other and further relief as this Court may

deem just and proper.


This 23rd day of April, 2021.

                                        **MEROLLA & GOLD, LLP**

                                        _____/s/ A. Todd Merolla_____
                                        A. TODD MEROLLA
                                        Georgia State Bar No. 502570
                                        Attorneys for Plaintiff

1072 W. Peachtree Street # 7488
Atlanta, Georgia 30357
404-369-0631
atm@merollagold.com

# EXHIBIT A



**U.S. SECURITIES AND EXCHANGE COMMISSION**
**ATLANTA REGIONAL OFFICE**
**950 East Paces Ferry Road N.E., Suite 900**
**Atlanta, GA 30326-1382**

Matthew F. McNamara

Assistant Regional Director
Division of Enforcement

Direct Dial (404) 842-7688
Facsimile (404) 842-7633
mcnamaram@sec.gov

August 15, 2016

**VIA UPS and Email (johnsm@gtlaw.com)**

Matthew Johns, Esq.
Greenberg Traurig, LLP
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305

Re:     **In the Matter of LPL Financial, LLC (A-03628)**

Dear Mr. Johns:

This letter will confirm that the staff of the Securities and Exchange Commission (the "Commission") has made a preliminary determination to recommend that the Commission file an enforcement action against your clients, Keystone Capital Partners, Inc. dba Federal Employee Benefit Counselors ("FEBC"), Christopher Laws, Jonathan Cooke, Danny Hood, and Brandon Long.  This proposed action would allege their violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, as well as violations of Section 17(a) of the Securities Act of 1933, and, with respect to Mr. Laws, violations of Section 15(b) of the Exchange Act for his failure reasonably to supervise the conduct of Mr. Cooke, Mr. Hood, and Mr. Long.  The proposed action concerns the sale of variable annuities to participants in the Thrift Savings Plan.  The recommendation may involve an administrative proceeding or a civil injunctive action in district court.  The recommendation may seek remedies that include a cease-and-desist order or civil money penalties.

As described in Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 C.F.R. § 202.5(c), we are offering each of your clients the opportunity to make a Wells Submission. For further information, you may wish to review Securities Act Release No. 5310, "Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations," which can be found at:  http://www.sec.gov/divisions/enforce/wells-release.pdf.

If your clients wish to make a written or videotaped submission setting forth any reasons of law, policy, or fact why the proposed enforcement action should not be filed, or bringing any facts to the Commission's attention in connection with its consideration of this matter, you should send the submission to me by no later than **Wednesday, September 7, 2016**.  Any written submission should be limited to 40 pages, and any video submission should not exceed 12 minutes.  Please inform me by no later than **Thursday, August 25, 2016** whether your clients will be making a Wells Submission.  Any submission should be sent to:

Matthew Johns, Esq.
August 15, 2016
Page 2

Matthew F. McNamara
Assistant Director, Division of Enforcement
Securities and Exchange Commission
950 East Paces Ferry Road N.E., Suite 900
Atlanta, GA 30326-1382

If the staff makes an enforcement recommendation to the Commission in this matter with respect to your clients, we will send to the Commission any submission that your clients make. The Commission may use the information contained in such a submission as an admission, or in any other manner permitted by the Federal Rules of Evidence, or for any of the Routine Uses of Information described in Form 1662, "Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena." Form 1662 can be found at: http://www.sec.gov/about/forms/sec1662.pdf, paper copies are available upon request. The staff will not accept any submission that purports to limit its admissibility under the Federal Rules of Evidence or the Commission's ability to use the submission for any purpose identified in Form 1662. Any submission your clients make may be discoverable by third parties in accordance with applicable law.

If you have any questions, please contact me at (404) 842-7688.

Sincerely,

Matthew F. McNamara
Assistant Director, Division of Enforcement

# EXHIBIT B

**FOIA CONFIDENTIAL TREATMENT REQUESTED BY KEYSTONE CAPITAL PARTNERS, INC. D/B/A FEDERAL EMPLOYEE BENEFIT COUNSELORS, CHRISTOPHER LAWS, JONATHAN DAX COOKE, DANNY HOOD, AND BRANDON LONG**

# UNITED STATES OF AMERICA

## before the

## SECURITIES AND EXCHANGE COMMISSION

| | |
|---|---|
| In the Matter of LPL FINANCIAL, LLC | File No. A-03628 |

## JOINT SUBMISSION ON BEHALF OF KEYSTONE CAPITAL PARTNERS, INC. D/B/A FEDERAL EMPLOYEE BENEFIT COUNSELORS, CHRISTOPHER LAWS, JONATHAN DAX COOKE, DANNY HOOD, AND BRANDON LONG

/s/ *Matthew S. Johns*

Matthew S. Johns
Greenberg Traurig LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, Georgia 30305
Telephone: 678-553-2647
johnsm@gtlaw.com

*Counsel for Keystone Capital Partners, Inc.*
*D/B/A Federal Employee Benefit Counselors,*
*J. Dax Cooke, Danny Hood, and Brandon Long*

/s/ *Stephen D. Councill*

Stephen D. Councill
ROGERS & HARDIN LLP
2700 International Tower, Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA 30303
Telephone:  404-522-4700
Facsimile:  404-525-2224
scouncill@rh-law.com

*Counsel for Christopher Laws*

# TABLE OF CONTENTS

THE STAFF'S PROPOSED ALLEGATIONS ................................................................ 2

    A.    Respondents ................................................................................................ 3

        1.    Keystone Capital Partners, Inc. d/b/a Federal Employee Benefit
                Counselors. .................................................................................. 3
        2.    Christopher Laws .......................................................................... 3
        3.    Jonathan Dax Cooke ..................................................................... 3
        4.    Danny Hood ................................................................................. 4
        5.    Brandon Long ............................................................................... 4

    B.    Other Parties .............................................................................................. 4

        1.    LPL Financial, LLC ...................................................................... 4

FACTS ......................................................................................................................... 4

    A.    The Services Provided By Keystone ........................................................... 5

        1.    Keystone Uses an Initial Federal Government Employment
                Benefits Survey to Gather Information for Insurance Sales. ..................... 5
        2.    Scheduling the Initial Benefits Discussion and Review Conference. ......... 6
        3.    The Initial Federal Government Employment Benefits Review ................ 7
        4.    A Keystone Representative Conducts an Insurance Benefit Review
                if the Potential Customer Expresses Interest in Insurance ......................... 9
        5.    A Securities Licensed Professional Calls the Customer if the
                Customer Indicates an Interest in Securities. ............................................. 9

    B.    Respondents Disclosed Their Affiliation With LPL. ............................................ 10

DISCUSSION .............................................................................................................. 13

    I.    THE RESPONDENTS DID NOT VIOLATE SECTIONS 10(b) OR 17(a). ....... 13

    A.    Respondents Did Not Mislead Or Deceive Customers Into Believing
        Respondents Worked For Or Offered Products Of The Government .................. 15

        1.    Hal Shannon ................................................................................. 17
        2.    Ian Barlow ................................................................................... 18
        3.    Vivian Yuan ................................................................................. 18
        4.    Jill Cross ..................................................................................... 18
        5.    Rita Walston ................................................................................ 19

i

FOIA TREATMENT REQUESTED BY RESPONDENTS

B.    Respondents Did Not Misrepresent Or Conceal That Keystone's Customers Were Purchasing Variable Annuities.................................. 21

      1.    Ian Barlow and Liz Clark........................................................ 24
      2.    Jill Cross............................................................................... 25
      3.    Rita Walston........................................................................... 28
      4.    Vivian Yuan ........................................................................... 29

II.    MR. LAWS DID NOT FRAUDULENTLY OR OTHERWISE IMPROPERLY NOTARIZE CUSTOMER DOCUMENTS.............................. 30

    A.    Georgia Law regarding Notaries................................................. 30
    B.    The "Satisfactory" Signatory Evidence Obtained By Mr. Laws. ............. 32
    C.    There Is No Evidence That Mr. Laws Improperly Notarized Documents Or Forged Customer Signatures. ........................... 32

III.    MR. LAWS IS NOT LIABLE AS A CONTROL PERSON UNDER SECTION 20(a) OF THE EXCHANGE ACT ...................................... 33

IV.    RESPONDENTS DID NOT AID, ABET, OR CAUSE LPL'S BOOKS AND RECORDS VIOLATIONS UNDER SECTION 17(a) OR RULE 17(a)-4(b)(4) OF THE SECURITIES ACT......................................... 38

V.    RESPONDENTS DID NOT VIOLATE SECTION 15(a)(1) OF THE SECURITIES ACT.......................................................... 40

CONCLUSION................................................................................ 40

FOIA TREATMENT REQUESTED BY RESPONDENTS

# TABLE OF AUTHORITIES

**Federal Cases**

*Aaron v. SEC*,
    446 U.S. 680 (1980) ................................................................................14

*Armstrong v. McAlpin*,
    699 F.2d 79 (2d Cir.1983) ...............................................................37, 40

*Brown v. E.F. Hutton Group, Inc.*,
    991 F.2d 1020 (2d Cir.1993) ..................................................................16

*Carpenter v. Harris, Upham & Co.*,
    594 F.2d 388 (4th Cir. 1979) .......................................................35, 36, 37

*Cherokee Ins. Co. v. E.W. Blancho*,
    66 F.3d 117 (6th Cir. 1995) ...................................................................14

*Coates v. Heartland Wireless Commn's, Inc.*,
    100 F. Supp. 2d 417 (N.D. Tex. 2000) .................................................15

*Dickey v. Royal Banks of Mo.*,
    111 F.3d 580 (8th Cir. 1987) .............................................................31, 32

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ................................................................................14

*Hunt v. Alliance N. American Govt. Income Trust, Inc.*,
    159 F.3d 723 (2d Cir. 1998) ..................................................................16

*In re Hyperion Sec. Litig.*,
    1995 WL 422480 ....................................................................................24

*In re Initial Pub. Offering Sec. Litig.*,
    241 F.Supp.2d 281 (S.D.N.Y. 2003) ....................................................34

*In re Merrill Lynch ARS Litig.*,
    704 F. Supp. 2d 378 (S.D.N.Y. 2010) ..................................................17

*Messer v. E.F. Hutton & Co.*,
    847 F.2d 673 (11th Cir. 1988) ...............................................................15

*In re Piper Capital Mgmt., Inc.*,
    SEC Rel. No. 2163, 2003 WL 22016298 (Aug. 26, 2003) ....................15

*Rochez Bros., Inc. v. Rhoades*,
    527 F.2d 880 (3d Cir. 1975) ..................................................................34

*S.E.C. v. Treadway*,
    430 F. Supp. 2d 293 (S.D.N.Y. 2006) ..............................................37, 40

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir.1996) .............................................................35, 36

*SEC v. Gane*,
    2005 WL 90154 (S.D. Fl. Jan. 4, 2005) ................................................14

FOIA TREATMENT REQUESTED BY RESPONDENTS

*SEC v. Goble*,
    682 F.3d 934 (11th Cir. 2012) ................................................................37, 39

*SEC* v. *Patty*,
    891 F.2d 295 (9th Cir. 1989) .........................................................................14

*SEC v. Radical Bunny, LLC*,
    2011 WL 1458698 (D. Ariz. April 12, 2011) ...............................................40

*SEC v. Shanahan*,
    646 F.3d 536 (8th Cir.2011) .............................................................14, 37, 39

*SEC v. True North Fin. Corp.*,
    909 F. Supp. 2d 1073 (D. Minn. 2012)..........................................................14

*VanCook v. SEC*,
    653 F.3d 130 (2d Cir. 2011)....................................................................37, 39

*Vernazza v. SEC*,
    327 F.3d 851 (9th Cir. 2003) .........................................................................15

*Ward v. Hobart Mfg. Co.*,
    450 F.2d 1176 (5th Cir. 1971) .......................................................................14

## State Cases

*Herrero v. Cummins Mid-America, Inc.*,
    930 S.W.2d 18 (Mo. Ct. App. 1996).............................................................32

## Federal Statutes

15 U.S.C. § 77q(a) ...............................................................................................13

15 U.S.C. § 78j(b) ................................................................................................13

15 U.S.C. § 78t(a) ................................................................................................34

## State Statutes

O.C.G.A. § 45-17-8(a)(1) ....................................................................................31

O.C.G.A. § 45-17-8(d) .........................................................................................31

O.C.G.A. § 45-17-8(e) .........................................................................................31

## Regulations

17 C.F.R. § 202.5(c).............................................................................................1

17 C.F.R. § 240.10b-5(b)....................................................................................13

17 C.F.R. § 240.17a-3 .........................................................................................38

FOIA TREATMENT REQUESTED BY RESPONDENTS

**Other Authorities and Cited Materials**

http://about.van.fedex.com/our-story/history-timeline/history/ .....................................................16

http://www.dale-e-payne.com/video/Jackson_Life_Prospectus.pdf .............................................22

http://www.myfebc.com/ .........................................................................................................17, 20

https://www.geico.com/about/corporate/at-a-glance/ ..................................................................16

Procedures Relating to the Commencement of Enforcement Proceedings and
    Termination of Staff Investigations, Nos. 33-5310, 34-9796, 1972 WL 130244
    (Sept. 27, 1972) .......................................................................................................................1

Restatement (Second) of Torts § 295A ........................................................................................14

FOIA TREATMENT REQUESTED BY RESPONDENTS

**UNITED STATES OF AMERICA**

**before the**

**SECURITIES AND EXCHANGE COMMISSION**

| | |
|---|---|
| In the Matter of LPL FINANCIAL, LLC | File No. A-03628 |

**JOINT SUBMISSION ON BEHALF OF KEYSTONE CAPITAL PARTNERS, INC.
D/B/A FEDERAL EMPLOYEE BENEFIT COUNSELORS, CHRISTOPHER LAWS,
JONATHAN DAX COOKE, DANNY HOOD, AND BRANDON LONG**

Keystone Capital Partners, Inc. d/b/a Federal Employee Benefit Counselors ("Keystone"), Christopher Laws, Jonathan Dax Cooke, Danny Hood, and Brandon Long hereby make this submission in response to the Staff's proposed recommendation that an enforcement action be brought against the Respondents.[1] No such action is warranted.

---

[1] This submission is provided solely in connection with the Staff's consideration of possible action against the Respondents, and is made without any admission that the conduct under investigation violated any laws, rules or regulations. Should the Staff decide to make any recommendation that varies in any respect from the issues and positions the Respondents have addressed, we request an opportunity to supplement this submission in accordance with Rule 5(c) of the Commission's Rules Regarding Information and Other Proceedings, 17 C.F.R. § 202.5(c), and Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations, Nos. 33-5310, 34-9796, 1972 WL 130244, at *1-2 (Sept. 27, 1972).

## THE STAFF'S PROPOSED ALLEGATIONS

The Respondents understand from the Wells notices and subsequent discussions that the Staff proposes to recommend that the Commission bring an enforcement action against the Respondents alleging violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) and Rule 10b-5(b) thereunder, Section 15(a)(1), and Section 21C(b) of the Securities Exchange Act of 1934, and with respect to Mr. Laws, violations of Sections 15(b) and 20(a) of the Exchange Act.  The Staff has explained to counsel for Respondents that these charges would be based on the following theories:

- The Respondents deceived certain customers by leading them to believe that Keystone was affiliated with the federal government;

- The Respondents deceived certain customers by failing to disclose that those customers were purchasing variable annuities issued by LPL through Respondents;

- The Respondents deceived certain customers by failing to disclose the fees associated with variable annuities they sold;

- Mr. Laws failed to reasonably supervise Mr. Cooke, Mr. Hood, and Mr. Long;

- Mr. Laws acted with intent to defraud by improperly notarizing and by forging customer signatures;

- Mr. Laws aided, abetted, and caused Mr. Cooke, Mr. Hood, and Mr. Long's alleged violation of securities laws, and is liable as a control person for their violations; and

- Mr. Laws aided, abetted, and caused LPL's books and records violations.

The Respondents respectfully submit that these theories are unsupported by the true facts, and that the evidence will show that they did not commit violations, and that they acted in good faith and not negligently, and that they certainly did not act with scienter.

2

FOIA TREATMENT REQUESTED BY RESPONDENTS

A.    **Respondents**

1.    **Keystone Capital Partners, Inc. d/b/a Federal Employee Benefit Counselors**

Keystone is an insurance agency through which non-security, fixed insurance products are offered and sold to employees of the federal government, with its principal place of business in Alpharetta, Georgia.  Keystone was founded on May 13, 2012 by Christopher Laws and Jonathan Dax Cooke.  Keystone has no adverse regulatory history.  Keystone does not market, solicit or sell securities to any of its customers.  Federal Employee Benefit Counselors is the doing-business-as name of Keystone.

2.    **Christopher Laws**

Christopher Laws is an individual currently residing in the State of Georgia.  During the period in question, Mr. Laws served as Keystone's president.  Mr. Laws holds Series 7, 24, 63, and 66 security licenses.  At all relevant times, until December of 2014, Mr. Laws was a registered representative of LPL Financial Holdings, LLC ("LPL"), a registered broker-dealer, and served as the OSJ supervisor for the Alpharetta, Georgia branch office of LPL.  Mr. Laws has been licensed to solicit and transact securities related transactions since 2002.  At no point during Mr. Law's nearly 15-year securities career has he ever received a formal customer complaint.

3.    **Jonathan Dax Cooke**

Jonathan Dax Cooke is an individual currently residing in the State of Georgia.  During the period in question, Mr. Cooke served as Keystone's Chief Executive Officer.  Mr. Cooke holds Series 7, 63, and 65 security licenses.  At all relevant times, until December of 2014, Mr. Cooke was a registered representative of LPL.

3

FOIA TREATMENT REQUESTED BY RESPONDENTS

### 4.   Danny Hood

Danny Hood is an individual currently residing in the State of Georgia.  During the period in question, Mr. Hood served as an independent contractor of Keystone.  Mr. Hood holds Series 7, 63, 65, and 66 security licenses.  At all relevant times, until December of 2014, Mr. Hood was a registered representative of LPL.

### 5.   Brandon Long

Brandon Long is an individual currently residing in the State of Georgia.  From 2013 through present, Mr. Long has served as an employee of Keystone.  Mr. Long holds Series 6 and security licenses.  Between May of 2014 and December of 2014, Mr. Long was a registered representative of LPL.

## B.   Other Parties

### 1.   LPL Financial, LLC

LPL Financial Holdings (commonly referred to as LPL Financial) is the largest independent broker-dealer in the United States. The company has more than 14,000 financial advisors, over $500 billion in advisory and brokerage assets, and generated approximately $4.3 billion in annual revenue for the 2015 fiscal year.  During the relevant period, the Respondents were registered representatives of LPL, and maintained LPL's Alpharetta, Georgia branch office of supervisory jurisdiction.

## <u>FACTS</u>

A review of Keystone's processes demonstrates that the Respondents never attempted or intended to mislead any potential customers into thinking they were affiliated with the federal government.  It also shows that securities were only sold through registered broker-dealers, and that Respondents never hid or concealed the fact that they were selling securities.

FOIA TREATMENT REQUESTED BY RESPONDENTS

### A.     The Services Provided By Keystone

Since 2013, Keystone has provided benefit counseling and planning services to thousands of federal government employees in connection with their Federal Employee Group Life Insurance (FEGLI), Federal Employee Health Benefits (FEHB), Federal Employee Pension Systems (CSRS/FERS), and related alternative benefit programs available to federal employees. Keystone assists federal government employees navigate the complex landscape of the various insurance, pension, and retirement benefits offered by the federal government to its employees. Shortly after Keystone began providing benefit related services to federal government employees, many of Keystone's customers approached Keystone and inquired if Keystone could provide assistance regarding the benefits available to those customers under the Thrift Savings Plan ("TSP"). Keystone's principals soon realized there was a significant demand among federal government employees for investment advice and assistance regarding investment options related to federal government employees' TSP funds.

As a result, Mr. Laws and Mr. Cooke created a structure whereby Keystone would refer federal employees interested in discussing their investment options to a securities-licensed registered representative on their team.   At all times, Mr. Laws and Mr. Cooke required any conversations about securities be handled by a properly licensed securities representative.

### 1.     Keystone Uses an Initial Federal Government Employment Benefits Survey to Gather Information for Insurance Sales.

Keystone typically initiates communications with potential customers by way of a survey that Keystone mails to potential customers.[2]   The survey asks the recipient to answer various questions about the recipient's knowledge and understanding of the recipient's federal government employment benefits.   The survey asks the recipient to provide Keystone with basic

---

[2] A true and correct exemplar of a prior Marketing Survey that Keystone previously provided to potential customers is attached as <u>Exhibit A</u>; (Keystone 002511).

FOIA TREATMENT REQUESTED BY RESPONDENTS

information regarding the recipient's background and employment information (e.g., age, telephone number, marital status, duration of employment with the federal government). The benefits survey further asks the recipient to indicate if he or she would like a Keystone representative to contact the recipient to discuss and review the recipient's current and available federal government employee benefits. Once the recipient has completed the survey, if the recipient desires to further communicate with Keystone, the recipient mails or faxes the completed benefits survey to Keystone.

The benefits survey was never designed to create the appearance that Keystone was part of the federal government. Indeed, the web site identified on the form (www.myfebc.com) makes clear that Keystone is a commercial enterprise and not a government agency.

In addition, in their continual effort to ensure potential customers understand that Keystone is not affiliated with the government, in 2014 Keystone added the following disclaimer:

> Federal Employee Benefit Counselors does not engage in the solicitation or sale of securities. Upon request, referrals are made to an affiliate company, Federal Employee Retirement Counselors, securities offered through BCG Securities, Inc. … Federal Employee Benefit Counselors is an independent organization and not a government agency.

### 2.    Scheduling the Initial Benefits Discussion and Review Conference.

When a potential customer has completed and returned a benefits survey to Keystone, and has indicated that they would like to discuss and review their federal government employment benefits with a Keystone benefits counselor, a Keystone administrative coordinator contacts that potential customer at the telephone number provided in the completed survey to schedule a teleconference where the potential customer and a Keystone benefits counselor will telephonically discuss and review that individual's federal government employment benefits. During this scheduling call, the Keystone administrative coordinator confirms that the

6

information provided by the potential customer in the completed survey is accurate.  In addition, the Keystone administrative coordinator informs the potential customer of the topics and information that will be discussed and reviewed during the initial benefit review.  The purpose of providing potential customers this information is to enable them to make an informed decision as to whether they would like to attend an initial benefit review and discussion with a Keystone benefits counselor.

Keystone's administrative coordinators never state or implies indirectly that Keystone is affiliated in any way with the federal government.  Indeed, as a matter of company policy, each Keystone administrative coordinator is trained and instructed to affirmatively notify each potential customer that Keystone is a "private organization,"[3] and is not affiliated with the federal government.[4]

### 3.    The Initial Federal Government Employment Benefits Review.

If the potential customer desires to schedule the initial federal government employment benefits review and telephonic conference, the Keystone benefits counselor calls at the scheduled time and begins by introducing him/herself to the potential customer.  Each Keystone benefits counselor is trained and instructed to affirmatively disclaim at the outset of each federal government employment benefits review conference that Keystone is a private organization and is not affiliated with the federal government.[5] The Keystone benefits counselor and the potential customer discuss the time period in which the potential customer intends to retire, and the potential customer's goals and objectives related to post-retirement insurance coverage and protection, including: (1) health insurance; (2) fixed life insurance; and (3) long-term care

---

[3] A true and correct copy of Keystone's Training Manual is attached as Exhibit B; (Keystone 002501).

[4] *See* footnote 33 *infra*.

[5] *Id.*

FOIA TREATMENT REQUESTED BY RESPONDENTS

insurance.  The Keystone benefits counselor then explains the various benefit options available to the potential customer through the federal government, and the costs associated with each of those options.  As a component of this discussion, the Keystone benefits counselor provides to the potential customer projected payouts related to the potential customer's social security and pension benefits.

After the Keystone benefits counselor has reviewed all federal government benefits available to the potential customer, the Keystone benefits counselor identifies potential cost saving opportunities available in the private insurance sector and outside of the federal government benefits system related to the potential customer's life insurance, long-term care insurance, and disability insurance.  If the potential customer is interested in pursuing potential private-sector insurance options, the potential customer is referred to an insurance specialist.

Many potential customers, particularly those approaching 59.5[6] years of age, affirmatively inquire about the benefits options available under TSP during the initial federal government employment benefits review.  Keystone benefits counselors, however, are trained and instructed to inform the potential customer that only duly licensed securities representatives can discuss TSP related options with the potential customer.[7]  If the potential customer is interested in substantively discussing TSP related options, the customer is referred to a licensed securities representative.

---

[6] Current federal government employees must be 59.5 years old to withdraw TSP funds without incurring an early-withdrawal penalty.

[7] *See* Exhibit B; (Keystone 002507) (stating company policy that "FEBC counselors do not engage in any discussion regarding specific investments within the TSP plan since they are classified as securities.  Any violation of this rule will result in immediate termination … [the topic of TSP] should not be discussed …") (emphasis in original).

FOIA TREATMENT REQUESTED BY RESPONDENTS

**4.    A Keystone Representative Conducts an Insurance Benefit Review if the Potential Customer Expresses Interest in Insurance.**

If the potential customer asks to speak with an insurance specialist, an insurance benefit review is scheduled.  A Keystone insurance specialist discusses the potential customer's existing insurance policies and coverage.  The Keystone insurance specialist will compare the potential customer's stated insurance preferences and objectives, and determine the most cost-effective options available in the private sector that will enable the potential customer to achieve their preferences and objectives while realizing the most savings.  To that end, the Keystone specialist will typically provide the potential customer with pricing information from several insurance carriers to arrive at the most preferential option.

If the potential customer wishes to purchase an insurance policy, the Keystone insurance specialist will mail to the potential customer policy and pricing information along with policy applications.  The potential customer is then referred to Keystone's insurance underwriting specialist who assists the potential customer with the application and underwriting process.

**5.    A Securities Licensed Professional Calls the Customer if the Customer Indicates an Interest in Securities.**

If at any point during the foregoing conference calls the potential customer indicates an interest in discussing what TSP options are available, a call is scheduled with a securities licensed professional (i.e., a registered representative). The registered representative asks the potential customer a series of detailed questions regarding the potential customer's: (1) non-TSP sources of income; (2) investment goals and objectives; (3) intended age of retirement; (4) intended age of commencing withdrawals from retirement accounts; (5) need for continued spousal support income in the event of the potential customer's death; (6) changes in investment allocations during the previous ten years; (7) investment management preferences; (8) current

FOIA TREATMENT REQUESTED BY RESPONDENTS

investment allocation within TSP and, if applicable, the potential customer's other investments; and (9) current and future income needs.

After the potential customer has provided the foregoing information, the registered representative discusses with the potential customer various investment options available.

### B.   Respondents Disclosed Their Affiliation With LPL.

At all times applicable to this matter, each Respondent was a registered representative of LPL. LPL provides its independent contractor registered representatives, such as the Respondents, with online access to LPL's proprietary trading platform called "BranchNet." BranchNet is used to place customer trades, open new accounts, and review accounts and commissions. BranchNet is accessible through the Internet from any computer with a Web browser.

Each variable annuity transaction at issue in this matter was submitted by Respondents to LPL through BranchNet. LPL required that a new customer account be opened for each annuity transaction. Without an account, an LPL registered representative cannot obtain the forms to submit and process the annuity transaction. To open an account, the registered representative is required to submit through BranchNet all required customer background information. LPL did not have a unified form that would enable registered representatives to collect the customer information required to process an annuity application. Instead, the only account opening form provided by LPL to its registered representatives is the LPL – Account Application Retirement – Form F1BR (the "Account Application").[8]   The Account Application requests numerous categories of information that were irrelevant to the actual information required to open an LPL account for the purchase of an annuity, and which did not collect information needed for the annuity order entry system, such as beneficiary information, rider selection, and investment

---

[8] A true and correct exemplar of the Account Application Retirement – Form F1BR is attached as <u>Exhibit C</u>.

FOIA TREATMENT REQUESTED BY RESPONDENTS

allocation for sub accounts.  As a result, the Respondents created a data collection form for the purposes of streamlining the annuity application process.

The Staff has focused on these initial data collection forms, but these were only used to gather preliminary information necessary to set up an account in LPL's system, which then generated pre-populated forms provided to the customers for signature before a securities transaction was consummated.

To open an account, the customer must provide the registered representative the following information: (1) the customer's legal name; (2) marital status; (3) date of birth; (3) address; (4) telephone number; (5) social security number; (6) employer; and (7) length of employment.  The customer must also provide information regarding the customer's investment objectives, risk tolerance, and liquid net-worth.

Once the LPL registered representative obtains this information, it is then entered into the BranchNet System, and an account is opened.  Upon the opening of the account, BranchNet then uses the customer information submitted by the registered representative to pre-populate the forms required to complete the annuity application process.

Those pre-populated forms were then printed and mailed to the customer for completion, verification, and signature.  Included among those forms was the LPL – Electronic Prospectus Delivery Form, which authorized LPL to deliver electronically to the customer the prospectus related to the customer's variable annuity.[9]

When the customer returned the annuity application and enrollment forms to Keystone, a Keystone representative then scanned and submitted those forms to LPL through BranchNet's document retention system.  Notably, the Annuity Order Entry System requires all information requested on the Annuity Order Entry Form to be provided before an annuity trade can be

---

[9] A true and correct copy of the LPL – Electronic Prospectus Delivery Form is attached as Exhibit M.

11

FOIA TREATMENT REQUESTED BY RESPONDENTS

processed.  If all required information is not properly provided, the annuity trade would be rejected.[10]  Thus, it was not possible to complete an annuity transaction without first submitting fully completed versions of all required annuity order entry forms.[11]

When the properly completed Annuity Order Entry Forms were submitted, the registered representative received a series of documents from both LPL and the insurance carrier to provide the customer with disclosures regarding their variable annuity product.[12]  Included among those documents was Jackson National Life Insurance's "Electronic Delivery Authorization Form," which authorized Jackson National Life Insurance to deliver electronically to the customer the prospectus related to the customer's variable annuity.[13]  The customer then completed, signed, and returned the disclosure documents to Respondents.  The disclosure documents issued by LPL were then uploaded to the BranchNet system, whereas the insurance carrier issued disclosure documents were mailed to the carrier.[14]  In the event that the insurance carrier did not promptly receive completed disclosure forms, it would contact the customer directly and again request that the customer return to the carrier the completed disclosure documents.

Upon receipt of the customer's completed and signed disclosure documents, the insurance carrier provided a copy of the policy contract to the registered representative. The final

---

[10] *See* Staff Investigation Exhibit 41 – LPL – "AOE Document Comparison – Supervisory Principal Training" (discussing how to ensure all appropriate LPL annuity opening documents are filed via LPL's online system, and indicating that missing documents will be automatically flagged – "if all required forms have not been received an email will be sent to the advisor … if fields are missing data, an email will be sent to the advisor requesting a completed form.").

[11] *Id.*

[12] *See, e.g.,* Staff Investigation Exhibit 91 – Ms. Cross' executed LPL – "Important Information Regarding Your Annuity Purchase;" see also Staff Investigation Exhibit 92 – Letter from LPL to Ms. Cross (providing instructions for online access to "disclosure documents" related to Ms. Cross Annuity."); Staff Investigation Exhibit 90 – Jackson National Life Insurance – Client Acknowledgment Form.

[13] A true and correct copy of the Jackson National Life Insurance's "Electronic Delivery Authorization Form" is attached as Exhibit N.

[14] Unless the customer authorized Jackson National Life Insurance to deliver the prospectus electronically to the customer.

FOIA TREATMENT REQUESTED BY RESPONDENTS

policy contract was then delivered to the customer, and the variable annuity transaction was complete.

## DISCUSSION

## I.     THE RESPONDENTS DID NOT VIOLATE SECTIONS 10(b) OR 17(a).

Section 10(b) of the Exchange Act renders it unlawful for a person "[t]o use or employ ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).  Pursuant to its rulemaking authority under section 10(b), the SEC adopted Rule 10b-5, which provides, in pertinent part, that "[i]t shall be unlawful for any person, directly or indirectly, ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

The language of Section 17(a) of the Securities Act largely mirrors the phrasing of Rule 10b-5 and provides that:

> It shall be unlawful for any person ... directly or indirectly (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.[15]

Scienter is required to prove a violation of Section 10(b), Rule 10b-5, and Section 17(a)(1), while Sections 17(a)(2) and (3) are proven by showing a defendant acted at least negligently.[16] Scienter requires proof of intent to deceive or severe recklessness.[17]

---

[15] 15 U.S.C. § 77q(a).

[16] *SEC v. Shanahan*, 646 F.3d 536, 541 (8th Cir.2011) (citing *Aaron v. SEC*, 446 U.S. 680, 695, (1980)); *SEC v. True North Fin. Corp*., 909 F.Supp.2d 1073, 1122 (D. Minn. 2012).

[17] *Id.* at 543.

FOIA TREATMENT REQUESTED BY RESPONDENTS

A party's fraudulent intent, defined as "a mental state embracing intent to deceive, manipulate, or defraud," is the touchstone of a violation under Sections 10(b) and 17(a)(1).[18]

To prove scienter with respect to a non-disclosure, it is not enough to simply show that the defendant was aware of an undisclosed fact that a court later determines is material.[19] Rather, a plaintiff must show that the defendant must have been aware of both the materiality of the undisclosed fact and that its nondisclosure would likely mislead investors.[20]

With respect to Section 17(a)(2) and (3), although the Staff need not establish fraudulent intent, it still must demonstrate the existence of negligence, defined as a departure from the standard of reasonable care.[21] The reasonableness of conduct must be judged in light of the customs and practices of others in similar circumstances at the time the conduct occurred.[22] Compliance with industry standards is a factor (although not dispositive) in determining whether a party met the appropriate standard of care in cases under the securities laws.[23]

The record in this investigation has revealed no evidence of negligence, let alone fraudulent intent or extreme recklessness, by the Respondents.

---

[18] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

[19] *SEC v. Gane,* No. 03-61553-CIV-SEITZ, 2005 WL 90154, at *15 (S.D. Fl. Jan. 4, 2005) (internal citations omitted); *see also SEC* v. *Patty*, 891 F.2d 295, 295 (9th Cir. 1989) (stating that "the question is not merely whether [the defendant] had knowledge of the undisclosed facts; rather, it is the danger of misleading buyers that must actually be known or so obvious that any reasonable man should be legally bound as knowing.") (internal citations omitted)).

[20] *Id.*

[21] *Aaron v. SEC*, 446 U.S. 680, 687-91 (1980).

[22] *See Cherokee Ins. Co. v. E.W. Blancho*, 66 F.3d 117, 123 (6th Cir. 1995) (insurance broker "acted in accordance with practices customary in the industry at the time"); *Ward v. Hobart Mfg. Co.*, 450 F.2d 1176, 1182 and n.16 (5th Cir. 1971) (design of product consistent with industry practices at the time); Restatement (Second) of Torts § 295A.

[23] *See Vernazza v. SEC*, 327 F.3d 851, 861 (9th Cir. 2003) ("relevant to show standard of care necessary to a recklessness inquiry"); *Messer v. E.F. Hutton & Co*., 847 F.2d 673, 679 (11th Cir. 1988) (same); *Coates v. Heartland Wireless Commn's, Inc*., 100 F. Supp. 2d 417, 425 n.6 (N.D. Tex. 2000) (absent contrary evidence, a defendant who follows industry practices is not liable for fraud under 10(b)); *In re Piper Capital Mgmt., Inc.*, SEC Rel. No. 2163, 2003 WL 22016298, at *8 (Aug. 26, 2003) ("compliance with industry standards is a consideration").

FOIA TREATMENT REQUESTED BY RESPONDENTS

### A.    The Respondents Did Not Mislead Or Deceive Customers Into Believing Respondents Worked For Or Offered Products Of The Government.

The Staff contends that the Respondents fraudulently represented to potential customers or misled them into believing that Keystone was affiliated with the federal government in violation of Section 17(a), Section 10(b) and Rule 10(b)(5) thereunder.  There is no evidence that any of the Respondents ever stated or said anything suggesting that they worked for or on behalf of the federal government.  Indeed, Keystone's processes were designed to inform potential customers early and often that they were not associated with the federal government.  While some customers claimed they thought Respondents worked for the federal government, they each conceded they assumed this for various reasons, but not because one of the Respondents told them that or said something specific that led them to think that misunderstanding. Instead, it is clear from the investigative testimony, that those customers unreasonably assumed or inferred that Keystone was affiliated with the federal government.   A customer's unreasonable assumption, however, cannot provide a basis for a finding of liability under Sections 10(b) and 17(a).

The alleged circumstances that purportedly led the testifying customers to "assume" or "believe" that Keystone was affiliated with the federal government are objectively unreasonable. For example, a reasonable investor would not assume that Keystone was somehow affiliated with the federal government simply because the company transacted business under the name "Federal Employee Benefit Counselors."[24]

Keystone's founders decided to transact business under the name "Federal Employee Benefit Counselors" because that name reflects the company's market – individuals employed by the federal government – and identifies the services that Keystone provides for those individuals.

---

[24] Shannon Transcript, pp. 23-24.

15

FOIA TREATMENT REQUESTED BY RESPONDENTS

Numerous other companies across the United States have similar names.  For example, GEICO is an acronym for "Government Employees Insurance Company.  *See* https://www.geico.com/about/corporate/at-a-glance/ (stating that GEICO's "name goes back to the beginnings of the company. Founder Leo Goodwin first targeted a customer base of U.S. government employees and military personnel."). Similarly, the founder of FedEx named his company Federal Express because, among other reasons, he hoped the name would resonate with the Federal Reserve Bank, a potential customer.[25]  Like Keystone, GEICO and Federal Express are not actually owned by or affiliated with the federal government.

An investor may not justifiably rely on their own mistaken assumption, particularly if, through minimal diligence, the investor should have discovered the truth." *Hunt v. Alliance N. American Govt. Income Trust, Inc.*, 159 F.3d 723, 730 (2d Cir. 1998); (citing *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir.1993)).  Here, to confirm their unsupported "assumptions," "thoughts," and "beliefs" regarding Keystone's and the Representatives' affiliation, or lack thereof, with the federal government, "minimal diligence" could have included simply asking the Representatives whether Keystone was affiliated with the federal government.  Yet, none of the testifying customers who provided investigative testimony conducted this minimal step of diligence.  Each of the customers could have also asked the Respondents or other Keystone personnel whether they worked for the government – there is zero evidence that any of the Respondents would have lied in response to such a question.

The testifying customers could have also taken the equally "minimal" step of visiting Keystone's website.  Had they conducted this minimal amount of diligence they would have discovered that neither Keystone nor the representatives were affiliated with the federal

---

[25] *See* http://about.van.fedex.com/our-story/history-timeline/history/.

16

FOIA TREATMENT REQUESTED BY RESPONDENTS

government.[26]   The testifying customers could have also exercised a minimal amount of diligence by conducting a search of the FINRA Broker Check database as to any of the individual Respondents.[27]   But the testifying customers did none of these things.   Indeed, a review of their testimony shows that their assumptions and misunderstandings were their own making or innocent happenstance and not directly caused by anything said by the Respondents.

### 1.     Hal Shannon[28]

For example, Mr. Shannon testified that due to the name "Federal Employee Benefit Counselors" he believed that Keystone was affiliated with the federal government.[29] Mr. Shannon further testified that he believed Keystone was a "Federal agency of some sort."[30] Notably, Mr. Shannon did not testify that Mr. Hood or any other Respondent represented to him that Keystone was in any way affiliated with the federal government. Mr. Shannon conceded eventually that he "would not say Hood actively lied to me" regarding FEBC's relationship, or lack thereof, with the federal government.[31]   Mr. Shannon could easily have asked Mr. Hood to explain or provide him with information regarding the nature of Keystone's relationship with the federal government, but he did not.

---

[26] *See* http://www.myfebc.com/ (disclaiming that "Federal Employee Benefits Counselors and Federal Employee Retirement Counselors, Inc. are independent organizations and are not government agencies or affiliated with the federal government.").

[27] *In re Merrill Lynch ARS Litig.*, 704 F. Supp. 2d 378, 401-03 (S.D.N.Y. 2010), aff'd, 671 F.3d 120 (2d Cir. 2011) (noting "that here, plaintiffs could have accessed the SEC Order, Website Disclosure, and offering prospectuses with "minimal diligence'").

[28] Hal Shannon is a former Keystone customer who received assistance with his federal government benefits from Danny Hood.   Mr. Shannon used the funds from his TSP account to purchase a variable annuity issued by LPL and underwritten by Jackson National Life Insurance.

[29] Shannon Transcript, pp. 23-24.

[30] *Id*. at 24.

[31] *Id.* at 26-27.

FOIA TREATMENT REQUESTED BY RESPONDENTS

### 2.   Ian Barlow[32]

Mr. Barlow testified that he "assumed" Keystone was "contracted" with the federal government because he received a telephone call from Keystone shortly before his retirement.[33] However, in a letter Mr. Barlow sent to the Staff on August 10, 2015, Barlow admitted that Keystone representative, Esther Gibbons, "identified herself as with FEBC and stated they were not part of the Federal Government."[34]

### 3.   Vivian Yuan[35]

Vivian Yuan testified that she believed that the federal government provided Keystone to federal government employees such as Ms. Yuan as an employment "benefit."[36]  But Ms. Yuan never testified that any of the Respondents indicated that Keystone was in fact affiliated with the federal government, and she never asked any of the Respondents to clarify or provide any information as to Keystone's governmental affiliation.

### 4.   Jill Cross[37]

Ms. Cross initially testified she had the "impression" that Keystone was somehow affiliated with the federal government.[38]  Ms. Cross indicated that she "assumed" that Mr. Cooke was "calling from the Federal government"[39] because Mr. Cook was aware that Ms. Cross

---

[32] Ian Barlow used the funds from his TSP account to purchase a variable annuity issued by LPL and underwritten by Jackson National Life Insurance.  Liz Clark is Mr. Barlow's spouse, and she participated in at least one telephonic conference between Mr. Barlow and Mr. Long.

[33] Barlow Transcript, pp. 10-12.

[34] See Staff Investigation Exhibit 98.

[35] Ms. Yuan is a former Keystone customer who received assistance with her federal government benefits from Danny Hood.

[36] Yuan Transcript, pp. 17, 24.

[37] Ms. Cross is a former Keystone customer who received assistance with her federal government benefits from Mr. Cooke.  Ms. Cross used the funds from her TSP account to purchase a variable annuity issued by LPL and underwritten by Jackson National Life Insurance.

[38] Cross Transcript, p. 17.

[39] A true and correct copy of Ms. Cross' October 27, 2014 letter to LPL is attached as Exhibit D.

FOIA TREATMENT REQUESTED BY RESPONDENTS

worked for the federal government, was close to retirement, and maintained a TSP account.[40] Notably, Ms. Cross did not testify that Mr. Cooke actually stated that he or Keystone was in anyway affiliated with the federal government.  Ms. Cross also stated in her October 27, 2014 letter that Mr. Cooke "invaded her privacy" by improperly obtaining information regarding Ms. Cross' federal benefits and personal finances.  Ms. Cross most likely forgot that she had completed a questionnaire and had earlier calls with other Keystone representatives where she provided information regarding her federal government benefits to Keystone's representatives.[41]

### 5.    Rita Walston

Rita Walston testified that she "assumed" that Keystone was somehow affiliated with the federal government even though no Keystone representative made any indication whatsoever regarding Keystone's governmental affiliation, or lack therefore, with the federal government.[42] Ms. Walston did not claim this assumption was based on some claim of a Keystone representative.  Instead, Ms. Walston went on to explain that she had no recollection of anything that was discussed during her first telephone interaction with Keystone.[43]  Ms. Walston testified that she "thought" Keystone was affiliated with the federal government because Brandon Long provided her with a variety of information regarding her retirement that the federal government would not disclose to Ms. Walston.[44]  Ms. Walston further testified that she had reason to believe Keystone was affiliated with the federal government because Brandon Long discussed "MetLife"

---

[40] *See id.*

[41] All of the details regarding Ms. Cross' TSP account, pension, and social security benefits were supplied to Mr. Cooke by Ms. Cross.  Ms. Cross even provided Mr. Cooke with the codes located on her federal employee paystub to enable Mr. Cooke to determine the cost associated with Ms. Cross' group life insurance policy, and Mr. Cooke used the information provided by Ms. Cross to determine the amount her estimated social security retirement payment.

[42] Walston Transcript, p. 21-22.

[43] *Id*. at 20.

[44] *Id*. at pp. 21-22.  Like Ms. Cross, Ms. Walston also likely forgot that she previously provided this information to a Keystone representative during her initial benefits review conference.

FOIA TREATMENT REQUESTED BY RESPONDENTS

and "Blackrock" products, which she believed were funds that were "government affiliated."[45] Yet Ms. Walston also repeatedly testified that she did not remember the contents of her discussion with Brandon Long.[46]

The foregoing testimony makes clear that some customers might have assumed Keystone had a government connection, but none of them testified that their misunderstanding was based on affirmative misrepresentations, or even material omissions, of the Respondents.

Of course, Keystone has no legal duty to disclose that it is not affiliated with the federal government because that information is publicly available and not material to a reasonable investor.[47]  Nevertheless, Keystone expressly discloses on its website,[48] marketing materials,[49] and e-mail communications[50] that Keystone is an independent organization and is not a government agency or affiliated with the federal government.  Keystone has also implemented internal policies requiring all company representatives to immediately disclose to all customers that Keystone is a "private organization," and prohibiting all company representatives from indicating that Keystone is affiliated with the federal government.[51]

---

[45] *Id*.

[46] *Id*. pp. 24, 29.

[47] *Wang v. Bear Stearns Companies, LLC*, 14 F.Supp.3d 537, 547 (S.D.N.Y 2014); *Hunt v. Alliance N. Am. Gov't Income Trust, Inc*., 159 F.3d 723, 730 (2d Cir.1998)*see also Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 980-81 (9th Cir. 1999) (no duty to disclose information "that the market was aware of" from news articles).  For this reason, even if Mr. Long did not properly address Ms. Walston's comment regarding her surprise that Jackson National Life Insurance was affiliated with government – which Respondents dispute – Mr. Long cannot be found to have violated any securities law. *See* Walston Transcript, pp. 21-22.

[48] *See* http://www.myfebc.com/ (last visited Dec. 19, 2016) (disclaiming that "Federal Employee Benefits Counselors and Federal Employee Retirement Counselors, Inc. are independent organizations and are not government agencies or affiliated with the federal government.").

[49] A true and correct copy of a TSP Analysis presentation is attached as Exhibit E (disclaiming "we are not federal employees or affiliated with the federal government."); *see also* (Keystone 002511) (disclosing that "Federal Employee Benefits Counselors is an independent organization and is not a government agency.").

[50] A true and correct copy of an exemplar of the disclaimer affixed to each e-mail sent from an FEBC e-mail domain is attached as Exhibit F.

[51] *See* Exhibit B, (Keystone 002501).

20

Accordingly, contrary to the Staff's suggestion that Respondents devised a scheme to mislead federal employees into believing Respondents were somehow affiliated with the federal government, Respondents have taken reasonable measures to ensure that all potential and actual customers are aware that Respondents are not in any way affiliated with the federal government.

**B.    The Respondents did not Misrepresent or Conceal that Keystone's Customers were Purchasing Variable Annuities or their Associated Fees and Expenses.**

The Staff contends that the Respondents improperly failed to disclose to certain customers that those customers were purchasing variable annuities.  The Staff theorizes that Respondents removed all references to the term "variable annuity" and to LPL in an effort to deceive customers into believing they were choosing an option in the TSP rather than buying a security from a broker-dealer.  In support of its theory, the Staff points to certain forms used to collect information used by Keystone personnel to generate account opening documentation. The Staff's theory ignores all the other information and documentation provided by the Respondents to their customers, and it is simply impossible for those customers to be reasonably unaware that they were purchasing a variable annuity from LPL by the time the transaction occurred.

For example, each of the Respondents repeatedly and consistently testified that they believed Keystone's customers received copies of the prospectus, from both LPL and Jackson National Life Insurance, prior to the execution of the variable annuity policy contact and the withdrawal of the customer's TSP funds.

All of the customers knew or should have known they were supposed to receive a prospectus.  For example, Ms. Cross, Ms. Walston, and Ms. Yuan all provided to the Staff written certifications from their own records in which each of them expressly acknowledged that they received a copy of the prospectus related to their Jackson National Life Insurance annuity.

FOIA TREATMENT REQUESTED BY RESPONDENTS

Mr. Barlow and Mr. Shannon conceded they might not have kept documents, such as a prospectus and the written acknowledgment as to their receipt of the prospectus.  The LPL – Electronic Prospectus Delivery Form was included in every annuity enrollment package Keystone sent to customers.  The reason why certain of the testifying customers did not have copies of the prospectus in their files is now apparent.  Some of these customers likely signed up for electronic delivery and others acknowledged they would not have kept large paper documents.

The prospectus, of course, unequivocally establishes that the underlying securities product is a variable annuity.  To that end, the first page prospectus related to the Jackson National Life Insurance variable annuity product purchased by each of the testifying customers conspicuously states the phrase "Variable Annuities."[52] Thereafter, the term "annuity" is set forth no less than <u>235</u> times in the prospectus.

In addition to the prospectus, other documents informed customers they were buying a variable annuity. Mr. Barlow,[53] Ms. Cross,[54] Mr. Shannon,[55] Ms. Walston,[56] and Ms. Yuang[57] each received from either LPL or Jackson National Life Insurance disclosure documents that unequivocally notified those customers that they purchased a variable annuity.  These documents reference:  (1) the "annuity contract information;" (2) "variable annuity purchase information;" (3) the variable annuity surrender schedule; (4) information regarding the variable annuity rider;

---

[52] http://www.dale-e-payne.com/video/Jackson_Life_Prospectus.pdf

[53] *See* Staff Investigation Exhibit 57 – Mr. Barlow's executed LPL – Important Information regarding your Annuity Purchase Form.

[54] *See* Staff Investigation Exhibit 91 – Ms. Cross' executed LPL – Important Information regarding your Annuity Purchase Form.

[55] *See* Staff Investigation Exhibit 61 – Mr. Shannon's Jackson National Life Insurance Annuity Order Summary Report.

[56] *See* <u>Exhibit G</u> – Ms. Walston's executed LPL – Important Information regarding your Annuity Purchase Form.

[57] *See* Staff Exhibit 179 – Ms. Yuan's executed LPL – Important Information regarding your Annuity Purchase Form.

FOIA TREATMENT REQUESTED BY RESPONDENTS

(5) whether the customer is purchasing an "annuity with a premium enhancement;" and (6) that the customer previously received the variable annuity prospectus.[58]

Moreover, the marketing materials utilized by the Respondents also expressly disclose that the securities product at issue is a variable annuity.[59]  Those marketing materials clearly illustrate that the Jackson National Life Insurance variable annuity is outside of the TSP's framework.  For example, page 8 of the "TSP Analysis" presentation, clearly indicates that the Black Rock fund is within TSP, whereas Jackson National Life Insurance and Prudential fall outside of options available within TSP.[60]  Similarly, page 9 of the TSP Analysis compares the performance of investments within the TSP to the Jackson National Life Insurance Variable Annuity.[61]  Lastly, page 10 of the TSP Analysis demonstrates the different features available within TSP to those available outside the TSP such as Jackson National Life Insurance or Prudential.[62]

Further, from the very first moment that a Keystone registered representative speaks with a potential customer, the representative is trained to explain that the Jackson National Life Insurance annuity is a variable annuity.  As such, when all the information provided to Keystone's customers is taken as a whole, it is not impossible for a customer who has listened to the statements made by Keystone's registered representatives, and read the disclosure documents

---

[58] A true and correct copy of Ms. Cross' Client Acknowledgment Form is attached as <u>Exhibit H</u> ("I hereby acknowledge receipt of contract # 1015919546, which was delivered to me on August 15, 2014 … "I have been given a current prospectus for this variable annuity …"); Staff Investigation Exhibit 90.

[59] *See* <u>Exhibit I</u> – Keystone TSP Analysis (expressly disclosing that "a variable Annuity is a long-term investment vehicle designed specifically for retirement. While they are subject to market risk and fluctuation in account value, they may also offer several optional protection features not found in other investment vehicles. All Securities are sold through Prospectus only and will be made available to those persons electing a free non-obligatory, confidential consultation and analysis to determine specific suitable product recommendations. A prospectus should be read carefully to determine the investment objectives, risks, charges and expenses of the variable annuity before investing.").

[60] *See id*. at 8.

[61] *Id* (comparing rate of returns for funds within "TSP" to "Jackson National").

[62] *Id.*

23

provided to the customer by Respondents, to be reasonably unaware that the underlying product was a variable annuity.[63]

Similarly, although a select few of Keystone's former customers claimed that the surrender charges and other fees related to their annuity were not disclosed to them, the documentary evidence establishes otherwise.[64]   Notably, each of the testifying customers received and/or signed disclosure documents that properly disclosed that information.[65]

A review of the testimony shows that Respondents did not mislead any customers by failing to disclose they were selling annuities or the fees or other expenses associated with those annuities:

### 1.    Ian Barlow and Liz Clark

Mr. Barlow and Ms. Clark both initially testified that they never received a copy of the prospectus related to Mr. Barlow's Jackson National Insurance variable annuity.[66]   However, Ms. Clark later testified that neither she nor Mr. Barlow could locate numerous e-mail communications previously received from Mr. Long and certain paperwork regarding Mr. Barlow's Jackson National Life Insurance variable annuity.[67]

Mr. Barlow testified that he could not remember what documents he actually received from Mr. Long.[68]   Mr. Barlow also testified, on the one hand, that he never received a copy of the

---

[63] *In re Hyperion Sec. Litig.*, 1995 WL 422480, at *8 (finding "investor's failure to review prospectus is unreasonable").

[64] *See, e.g.*, Cross Transcript, p. 25; Shannon Transcript, pp. 29, 30; Yuan Transcript, p. 34.

[65] *See, e.g.*, Staff Investigation Exhibit 61 – Mr. Shannon's Jackson National Life Insurance Annuity Order Summary Report; Exhibit G – Ms. Walston's executed LPL – Important Information regarding your Annuity Purchase Form; *See* Staff Exhibit 179 – Ms. Yuan's executed LPL – Important Information regarding your Annuity Purchase Form.; Staff Investigation Exhibit 55 – Mr. Barlow's Jackson National Life Insurance Order Summary.

[66] Barlow Transcript, p. 62; Clark Transcript, p. 65.

[67] Barlow Transcript, p. Clark Transcript, pp. 24, 25.

[68] Barlow Transcript, pp. 96-97.

FOIA TREATMENT REQUESTED BY RESPONDENTS

policy related to his Jackson National Life variable annuity.[69] But shortly thereafter, when the Staff provided Mr. Barlow with evidence that Jackson National Life Insurance provided Mr. Barlow with a copy of his variable annuity policy, Mr. Barlow testified that he was "really confused" regarding the documents that he previously received regarding his Jackson National Life variable annuity.[70-71]

Although Mr. Barlow thought he never received a document showing surrender charges,[72] Mr. Barlow could not remember what documents he received and his own notes reflect a discussion with Mr. Long about surrender charges.[73]  It is also clear from documents produced by other witnesses that Respondents provided the surrender fee schedule to their customers.

### 2.    Jill Cross

On October 27, 2014, Ms. Cross sent a letter to LPL wherein she requested a refund of the funds used to purchase her variable annuity.[74] In support of her request, Ms. Cross expressly represented, and later testified that:

---

[69] Barlow Transcript, p. 96.

[70] Barlow Transcript, p. 96; *see also* Staff Investigation Exhibit 57.

[71] For the documents he did keep, it appears Mr. Barlow may have rearranged the pages among several documents. The select documents that Mr. Barlow provided to the SEC are not properly organized and are arranged in a manner that is dissimilar to how the documents were organized when transmitted to Mr. Barlow.  For example, Mr. Barlow apparently attached the Jackson National Life Insurance "Request to Change Servicing Producer/ Representative Form" to the Jackson National Life Insurance Policy Contract.  *See* SECBARLOW E-0000048.  These are distinctly different forms that were not appended to one another by Respondents.  In addition, Mr. Barlow appears to have combined the cover page for Staff Investigation Exhibit 116 – TSP Election Forms – with Staff Investigation Exhibit 101 – the TSP Analysis provided to Mr. Barlow by Respondents – and then produced those documents to the Staff as a single document.  Those documents are not intended to appended to one another and are not transmitted by any of the Respondents to potential customers in that manner.

[72] Barlow Transcript, p. 58.

[73] See Staff Investigation Exhibit 100 – Mr. Barlow's Notes from Conversation with Mr. Long.

[74] *See* Exhibit E.

FOIA TREATMENT REQUESTED BY RESPONDENTS

Mr. Cooke did not provide me with a prospectus for the Jackson National Variable Annuity before or at the time of our discussion.  To help me understand, what I had, the advisor asked for a copy of the policy.  I keep good records and I am sure it was never sent to me in spite of the letter in my file saying it was enclosed.

Not only did Ms. Cross receive a letter stating a prospectus was enclosed, on August 15, 2014, Ms. Cross executed a document entitled "Client Acknowledgment Form," pursuant to which Ms. Cross acknowledged that she indeed received the prospectus and policy related to her Jackson National Insurance Annuity.[75]  Thereafter, on August 17, 2014, Ms. Cross executed a document entitled "Important Information Regarding Your Variable Annuity Purchase," wherein Ms. Cross again attested and certified – for a second and third time – that she previously received the prospectus related to her variable annuity.[76]  In addition, on August 8, 2014, Jackson National Life Insurance delivered to Ms. Cross a copy of the policy related to her Jackson National Life Insurance annuity.[77]

Later in her testimony, Ms. Cross explains why her testimony is inconsistent and contradictory:  she cannot recall the vast majority of her conversations with Mr. Cooke, has admittedly poor record keeping habits, and rarely reads important business and financial documents sent to her.

Ms. Cross admitted during her testimony that she did not retain copies of all the documents related to her Jackson National Life Insurance variable annuity.[78]  Ms. Cross further admitted that she deleted the e-mail communications she previously exchanged with Mr. Cooke regarding Jackson National Life Insurance variable annuity, and was therefore unable to confirm

---

[75] *See* Exhibit H.

[76] A true and correct copy of the Important Information Regarding Your Variable Annuity Purchase executed by Ms. Cross is attached as Exhibit I; Staff Investigation Exhibit 91.

[77] Staff Investigation Exhibit 85; August 4, 2014 letter sent by Jackson National Life Insurance to Ms. Cross that enclosed her variable annuity policy.

[78] Cross Transcript, p. 32.

FOIA TREATMENT REQUESTED BY RESPONDENTS

what documents she actually received from Mr. Cooke.[79]  Importantly, Ms. Cross explained that she does not:

> Read every page and paragraph [of her personal business and financial documents].  If I understand it is all part of the same package of what I'm dealing with at the time, then I don't read everything.[80]

Ms. Cross also acknowledged that the notes she provided to the Staff were confusing and potentially inaccurate.[81] Ms. Cross also testified that if she actually received her policy from Jackson National Life Insurance, she could have "discarded it."[82]  Further, Ms. Cross testified that she certainly received and signed her variable annuity contract, but that she did not "remember that at all."[83]  Thus, Ms. Cross' own testimony belies her claim that she did not receive her variable annuity prospectus or policy.

Ms. Cross' testimony contains numerous inaccuracies reflecting a lack of clear memory of the conversations and other events in question.  As an example, Ms. Cross testified that she did not receive any forms or documents from Mr. Cooke before receiving a check from TSP.[84] Setting aside that it is impossible for Ms. Cross to have withdrawn funds from her TSP account without receiving and signing forms and documents, on July 23, 2014 Ms. Cross – and her spouse Michael Cross – both executed and caused to be notarized a TSP-75 Form, pursuant to which Ms. Cross requested the withdrawal of the funds held in her TSP account.[85]  By way of further example, in her October 27, 2014 letter, Ms. Cross alleged that she was unaware that she would be withdrawing the funds held within Ms. Cross' TSP account.  Ms. Cross, however,

---

[79] *Id.* at 59.

[80] *Id.* at 60-62.

[81] *Id.* at 74.

[82] *Id.* at 75.

[83] *Id.* at 76.

[84] *Id.* at 21.

[85] A true and correct copy of Ms. Cross' notarized TSP 75 Form is attached as <u>Exhibit J</u>.

FOIA TREATMENT REQUESTED BY RESPONDENTS

personally requested that the TSP transfer "100%" of the balance held within Ms. Cross' TSP Account.[86] Ms. Cross initially testified that Mr. Cooke did not instruct her to download the TSP 75 Form from the TSP website, but later testified that she indeed visited the TSP website and downloaded the TSP 75 Form after Mr. Cooke provided her with those instructions.[87]

Ms. Cross testified that Mr. Cooke did not discuss the surrender charges or annuity fees.[88] Yet, on August 17, 2014, Ms. Cross executed a document entitled "Important Information Regarding Your Variable Annuity Purchase," which expressly and in detail sets forth the surrender charges related to Ms. Cross' variable annuity.[89]

### 3.   Rita Walston

Ms. Walston testified that she never received a copy of the prospectus or policy related to her Jackson National Life Insurance variable annuity.[90]   However, Ms. Walston signed an acknowledgement that on October 19, 2014 she received the prospectus related to her Jackson National Life Insurance variable annuity.[91]   Ms. Walston also testified numerous times that she did indeed receive the policy related to her Jackson National Life Insurance variable annuity.[92]

Ms. Walston went on to attest why her testimony is inherently inconsistent. Ms. Walston conceded that she did not keep or even read the information provided to her by Keystone:

---

[86] *Id.*

[87] Cross Transcript, pp. 21, 50.

[88] *Id*. at 25.

[89] *See* Exhibit I.

[90] Walston Transcript, pp. 10, 97.

[91]*See* Exhibit G.

[92] Walston Transcript, pp. 26, 38, 57.

FOIA TREATMENT REQUESTED BY RESPONDENTS

I didn't keep it.  I wrote down the number to call.  I talked to someone and it was positive information – I never got any details from them.  I get these emails and I don't read them all.  I don't completely read them.  I know I am close to retirement, so I thought, I am going to talk to somebody and said that they have some useful information.[93]

Ms. Walston further testified that she did not remember anything about her conversations with Mr. Long or the documents and information he provided to her.[94]  Ms. Walston even admitted that she "threw away" certain documents she received from LPL, Jackson National Life Insurance, and FEBC.[95]

### 4.    Vivian Yuan

Ms. Yuan testified that she did not receive a copy of the prospectus related to her Jackson National Life Insurance variable annuity.[96]  Yet Ms. Yuan certified under oath on three separate occasions[97] that she received a copy of the prospectus related to her Jackson National Life Insurance Annuity pursuant to the: (1) executed LPL - Important Information Regarding Your Mutual Funds Being Replaced Form; (2) executed Jackson National Life Insurance Delivery Receipt; and (3) Jackson National Life Insurance - Client Acknowledgement Form.  Ms. Yuan also mistakenly remembered that Mr. Laws came to her home, but that is not correct.  Mr. Laws has never met Ms. Yuan – at her home or otherwise.

The foregoing witnesses provided remarkably inconsistent and contradictory testimony during direct examination.  Ultimately, this testimony reflects lack of memories of the many conversations that occurred during the sales process, and does not establish that disclosures were

---

[93] Walston Transcript, p. 18.

[94] *Id.* at pp. 20, 24.

[95] *Id.* at 91.

[96] Yuan Transcript, p. 53.

[97] *See* Staff Investigation Exhibit 179 – Ms. Yuan's executed LPL – Important Information Regarding Your Mutual Funds Being Replaced Form; Staff Investigation Exhibit 180 – executed Jackson National Life Insurance Delivery Receipt; Staff Investigation Exhibit 181 – Jackson National Life Insurance – Client Acknowledgement Form.

FOIA TREATMENT REQUESTED BY RESPONDENTS

not made.[98]  But even without such evidence, the documentary evidence establishes very clearly that each customer knew the following before any transaction consummated:

1.      They were buying a variable annuity;

2.      They were rolling funds out of the TSP;

3.      They acknowledged receiving a prospectus;

4.      The variable annuity came with surrender charges and other fees; and

5.      Respondents worked for LPL.

Moreover, all customers had a "free look" period during which they could refund their purchase for a period of time after the transaction consummated.  This evidence refutes any suggestion that Respondents attempted to deceive customers into purchasing an annuity with fees and other expenses without knowing they were buying a securities product from a non-governmental financial services firm.  That simply did not happen.

## II.     MR. LAWS DID NOT FRAUDULENTLY OR OTHERWISE IMPROPERLY NOTARIZE CUSTOMER DOCUMENTS.

The Staff contends that Mr. Laws improperly notarized certain customer documents by failing to personally witness those costumers signing the notarized documents.  This argument, however, fails as a matter of law. Georgia law does not require a signatory to personally appear before a notary when signing a document for the purposes of notarization.  In addition, in all instances, Mr. Laws possessed "satisfactory evidence" as to the: (1) identity of each signatory; and (2) and authenticity of their signature.

### A.      Georgia Law Regarding Notaries.

Pursuant to Georgia law, a Notary Public has the authority to, among other things, "witness or attest signature or execution of deeds and other written instruments."[99]

---

[98] As an additional example, the fact that Mr. Barlow wrote down in his notes a discussion about surrender fees makes clear that Respondents were not hiding surrender fees or other product features and costs from the customers.

FOIA TREATMENT REQUESTED BY RESPONDENTS

Georgia law further provides that, in performing any notarial act, a notary shall confirm the identity of the signatory based on "personal knowledge <u>or on satisfactory evidence</u>."[100]   A notary is prohibited from executing a notarial certificate containing a statement "known by the notary to be false or perform any action with an intent to deceive or defraud."[101]

A signatory is not required to personally appear before a notary so long as the notary has "satisfactory evidence" of the:  (1) identity of signatory; and (2) authenticity of the signature.[102] For example, in *Dickey v. Royal Banks of Mo.*,[103] the Eighth Circuit held that a notary is not required to personally witness the attesting signatory sign the notarized document so long as the notary can "acknowledge the authenticity of the signature."[104]   There, the defendant bank employee notarized an annuity – even though the signatory did not personally appear before the notary at the time of signature.  The court absolved the notary of all liability arising from improper notarization of the annuity, and emphasized that "the notary's duty is merely to acknowledge the authenticity of the signature."[105]   The court found that the notary properly acknowledged the authenticity of the signature – even though she did not personally witness the signature – by confirming with the signatory over the telephone that the signatory indeed signed the document authorizing the transfer and assignment of the annuity.[106]

---

[99] *See* O.C.G.A. § 45-17-8(a)(1).

[100] *See* O.C.G.A. § 45-17-8(e) (emphasis added).

[101] *See* O.C.G.A. § 45-17-8(d).

[102] *See* O.C.G.A. § 45-17-8(e) (emphasis added).

[103] 111 F.3d 580 (8th Cir. 1987).

[104] *Id*. at 584 (citing *Herrero v. Cummins Mid-America, Inc.*, 930 S.W.2d 18, 22 (Mo. Ct. App. 1996)).

[105] *Id*.

[106] *Id*. at 582.

FOIA TREATMENT REQUESTED BY RESPONDENTS

**B.     The "Satisfactory" Signatory Evidence Obtained By Mr. Laws.**

At all times prior to notarizing any customer documents, Mr. Laws ensured that he possessed "satisfactory evidence" as to:  (1) the identity of the signatory; and (2) that the signature was indeed that of the person to which it purported to belong.  To that end, Mr. Laws required any signatory who did not personally appear before Mr. Laws to mail him a copy of the signatory's driver's license, or other valid government-issued identification with a clearly visible signature.  Upon receipt of the identification, Mr. Laws would compare the signature affixed on the document to be notarized with the signature set forth on the signatory's identification.  As a final step, prior to notarizing the document, Mr. Laws would confirm with the signatory over the telephone that the signatory actually signed the relevant document and mailed it to Keystone on the date reflected on the package or envelope received by Keystone.  Mr. Laws would only notarize a document if these requirements were strictly adhered to by the signatory.

Accordingly, at all times, Mr. Laws complied with applicable Georgia law, and did not act negligently – let alone with actual intent to defraud or deceive – in connection with Mr. Laws' notarization of customer documents.

**C.     There Is No Evidence That Mr. Laws Improperly Notarized Documents Or Forged Customer Signatures.**

The Staff did not ask Mr. Laws about his notary practices during testimony.

The Staff appears to rely upon the investigative testimony of Ms. Speed and Mr. Shannon in support of their contention that Mr. Laws improperly notarized customer documents.  But Ms. Speed only testified that she did not travel to Georgia to sign her TSP-75 Form in the presence of Mr. Laws.  As discussed above, Mr. Laws was not required to personally witness a signatory actually sign a notarized document.  And the Staff failed to inquire from either Mr.

32

Laws or Ms. Speed whether Mr. Laws took appropriate steps to confirm Ms. Speed's identity and the authenticity of her signature.

Mr. Shannon's testimony also fails to support a finding that Mr. Laws improperly notarized or forged any document.

Mr. Shannon claimed during testimony that he had not previously seen the document designated by the Staff as Exhibit 132 – Mr. Shannon's executed LPL Account Application Form – even though Mr. Shannon's signature was affixed to the document.[107] Mr. Shannon then testified that he indeed signed that same document.[108] Mr. Shannon later claimed that he did not actually sign that document, and that instead, his signature must have been forged.[109]

In a hasty attempt to show the signature affixed on his LPL Account Application Form was a forgery, Mr. Shannon provided a member of the Staff with a copy of his driver's license. However, Mr. Shannon promptly admitted that he could not confirm that the signature affixed to the LPL Account Application Form was indeed a forgery:

> I'll make one small caveat, I have often been dinged that my signature looks different each time I sign and without doing a true hand writing analysis, these two look awfully much the same.[110]

## III.   MR. LAWS IS NOT LIABLE AS A CONTROL PERSON UNDER SECTION 20(a) OF THE EXCHANGE ACT.

The Staff contends that Mr. Laws should be held jointly and severally liable under Section 20(a) of the Exchange Act for the other Respondents' violations of Section 10(b) and Rule 10(b)(5) thereunder of the Exchange Act and Section 17(a) of the Securities Act. Section 20(a) of the Exchange Act provides in relevant part that:

---

[107] Shannon Transcript, p. 64.

[108] *Id*.

[109] *Id*. at 86.

[110] *Id.*

FOIA TREATMENT REQUESTED BY RESPONDENTS

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person."[111]

To impose control liability pursuant to Section 20(a), the SEC must show that: (1) the defendant is a "controlling person[;]" (2) the "controlled person" violated securities law; (3) the defendant "was a culpable participant in the fraud" in that he directly or indirectly induced the underlying violation;[112] and (4) the defendant did not act in good faith.[113]

Here, most importantly, as discussed thoroughly above, the persons Mr. Laws controlled did not violate the securities laws.

In addition, Mr. Laws was never a culpable participant in any violations. Where the controlling person is a supervisor, the law holds that, "although the standards of supervision may be stringent, [the duty to supervise] does not create absolute liability for every violation of the securities laws committed by a supervised individual."[114]  Rather, "[i]t is required of the controlling person only that he maintain an adequate system of internal control, and that he maintain the system in a diligent manner."[115]  First, when Mr. Laws first became aware in October of 2014 that a Keystone customer claimed that she "assumed" that Keystone was somehow affiliated with the federal government, Mr. Laws took immediate corrective action.

Specifically, Mr. Laws engaged legal counsel to provide the Respondents with legal advice regarding securities law compliance.  Moreover, Mr. Laws revised the existing disclosures contained in Keystone's marketing materials regarding Keystone's governmental

---

[111] 15 U.S.C. § 78t(a).

[112] *See In re Initial Pub. Offering Sec. Litig.*, 241 F.Supp.2d 281, 392-93 n. 179 (S.D.N.Y. 2003)

[113] *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890-91

[114] *Carpenter v. Harris, Upham & Co.*, 594 F.2d 388, 394 (4th Cir. 1979).

[115] *Id.*; *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir.1996) ("To meet the burden of establishing good faith, the controlling person must prove that he exercised due care in his supervision of the violator's activities in that he 'maintained and enforced a reasonable and proper system of supervision and internal controls.'").

34

FOIA TREATMENT REQUESTED BY RESPONDENTS

affiliation to ensure that those disclosures were as robust and comprehensive as possible. Mr. Laws also revised the existing disclaimers included on the Respondents' e-mail communications and website.  In addition, Mr. Laws augmented Keystone's training policies and company procedures to require all Keystone representatives to disclose during their initial interaction with a potential customer that Keystone is a private organization that is not affiliated with the Federal government.  Further, Mr. Laws made it a terminable offense for any Keystone representative to claim that Keystone is affiliated with the federal government.[116]

Mr. Laws also took immediate action regarding the concerns voiced by a select few of Keystone's customers that they were allegedly unaware they had purchased a variable annuity. To that end, Mr. Laws revised the disclaimers set forth in Keystone's marketing materials to clearly indicate that the Representatives were engaged in the solicitation and sale of variable annuities.[117]  In addition, Mr. Laws instructed and directed each Keystone registered representative to provide all potential customers copies of full TSP-75 and LPL account opening forms so that Keystone's customers could review all potential documents – including those that are inapplicable and unnecessary – related to the annuity transaction.[118]

Thus, Mr. Laws was not a culpable participant in any alleged misconduct, nor did Mr. Laws knowingly and substantially assist any securities violations.   Instead, Mr. Laws

---

[116] *Id.*

[117] A true and correct copy of  the "TSP Analysis" that Mr. Laws created in late 2014 is attached as <u>Exhibit K.</u> (Conspicuously disclosing that a "<u>Variable Annuity is a long-term investment vehicle designed specifically for retirement. While they are subject to market risk and fluctuation in account value, they may also offer several optional protection features not found in other investment vehicles. All Securities are sold through Prospectus only</u> and will be made available to those persons electing a free non-obligatory, confidential consultation and analysis to determine specific suitable product recommendations. A prospectus should be read carefully to determine the investment objectives, risks, charges and expenses of the variable annuity before investing ... Securities offered through BCG Securities, Inc., member FINRA and SIPC. 888-394-2247. BCG Securities and FERC are separate unrelated companies. FERC and its representatives are fully independent and not affiliated with the federal government or any investment company. Guarantees are based on the claims paying ability of the insurance company(s) selected for investment.") (emphasis added).

[118] *See, e.g.*, <u>Exhibit O.</u>

FOIA TREATMENT REQUESTED BY RESPONDENTS

actively sought to improve Keystone and Respondents' compliance procedures, protocols, and training to prevent securities violations from occurring.

For similar reasons, Mr. Laws did not act in bad faith. Section 20(a) permits an affirmative defense of good faith.[119] Even if the SEC could establish that Mr. Laws was a culpable participant, Mr. Laws cannot be liable if the evidence proves that he took precautionary measures by diligently maintaining an adequate system of internal control.[120] Here, the evidence establishes that Mr. Laws took numerous precautionary measures to prevent a securities violation and maintained a more-than-adequate system of internal control.

Mr. Laws has a fifteen-year history of being compliant.[121] To date, Mr. Laws does not have a single customer complaint on his record. Moreover, Mr. Laws, in his supervisory role, routinely monitored the telephonic communications between Keystone's securities representatives and Keystone's potential and actual customers. The evidence will show that, at all relevant times, Mr. Laws acted in good faith in supervising the other Respondents. He maintained an adequate and diligent system of controls, and he therefore cannot be held strictly liable for the conduct deemed improper by the SEC.[122]

## III.   MR. LAWS DID NOT AID, ABET, OR CAUSE THE OTHER RESPONDENTS' ALLEGED VIOLATIONS OF SECTION 10(B) AND RULE 10(B)(5) THEREUNDER SECTION 17(A).

To establish liability for aiding and abetting a violation of Section 10(b) or Rule 10b-5 thereunder of the Securities Act, the Staff must prove: (1) the commission of a violation of Section 10(b), Rule 10b-5, or Section 17(a) by Respondents; (2) that Mr. Laws was a culpable

---

[119] *Carpenter*, 594 F.2d at 394.

[120] *First Jersey Sec.*, 101 F.3d at 1473.

[121] A true and correct copy of Mr. Laws' FINRA Broker Check Report is attached as <u>Exhibit L</u>.

[122] *Carpenter*, 594 F.2d at 394.

FOIA TREATMENT REQUESTED BY RESPONDENTS

participant in the misconduct; and (3) Mr. Laws knowingly and substantially assisted the primary violation by the other Respondents.[123]

As set forth above, there were no violations of Section 10(b), Rule 10b-5, or Section 17(a) of the Securities Act.  And Mr. Laws certainly did not knowingly provide any substantial assistance that proximately caused any securities law violations by the other Respondents or anyone else.[124]

Until October of 2014, no customer had ever filed a formal complaint against any of the Respondents.  Upon receipt of the complaint filed by Ms. Cross, and despite the fact Ms. Cross' allegations are, as shown above, entirely lacking in merit, Mr. Laws took action to ensure that no additional customers could assume or believe – regardless of how unreasonable those assumptions or beliefs might be – that Keystone was somehow affiliated with the federal government.  The action taken by Mr. Laws in that regard included supplementing Keystone's training and internal policies and procedures, revising the existing disclosure language set forth in Keystone's written marketing materials and websites, and imposing enhanced supervision over the registered representatives' customer interactions.  Accordingly, at all times, Mr. Laws steadfastly sought to prevent the other Respondents from violating any securities laws, and in no way did Mr. Laws knowingly participate in or assist anyone else's violations of securities laws. Mr. Laws therefore cannot be subject to aider or abettor liability.

---

[123] *SEC v. Goble*, 682 F.3d 934, 947 (11th Cir. 2012) (citing *VanCook v. SEC*, 653 F.3d 130, 142 (2d Cir. 2011); *SEC v. Shanahan*, 646 F.3d 536, 547 (8th Cir. 2011)).

[124] *S.E.C. v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 92 (2d Cir.1983)).

FOIA TREATMENT REQUESTED BY RESPONDENTS

## IV.   RESPONDENTS DID NOT AID, ABET, OR CAUSE LPL'S BOOKS AND RECORDS VIOLATIONS UNDER SECTION 17(A) OR RULE 17(A)-4(B)(4) OF THE SECURITIES ACT.

Section 17(a) of the Securities Act requires brokers and members of national securities exchanges to "make, keep, and preserve for such periods, such accounts, correspondence, memoranda, papers, books, and other records, and make such reports, as the Commission by its rules and regulations may prescribe."  Rule 17-4(b)(4) lists the types of books and records required to be maintained and kept current, and to include:

> Originals of all communications received and copies of all communications sent (and any approvals thereof) by the member, broker or dealer (including inter-office memoranda and communications) relating to its business as such, including all communications which are subject to rules of a self-regulatory organization of which the member, broker or dealer is a member regarding communications with the public..[125]

The Staff contends that by failing to transmit certain e-mail communications through LPL's e-mail hosting service, Respondents aided, abetted, or caused LPL to Section 17(a) and Rule 17a-4(b)(4) thereunder.  To establish liability against an alleged aider or abettor of a violation of Section 10(b) or Rule 10b-5 thereunder of the Securities Act, the Staff must prove: (1) the commission of a violation of Section 17(a) and Rule 17a-4(b)(4) by Respondents; (2) that Respondents were culpable participants in the misconduct; and (3) Respondents knowingly and substantially assisted the primary violation by LPL.[126]

During March of 2013, the Staff conducted an on-site review of Keystone's Alpharetta, Georgia office.  On August 28, 2013 the Staff issued its written findings (the "2013 Findings") wherein the Staff found, among other things, that LPL:  (1) violated NASD Rule 3010(b) by failing to review and approve FEBC's website; and (2) should have known since January 11,

---

[125] 17 C.F.R. § 240.17a-3.

[126] *SEC v. Goble*, 682 F.3d 934, 947 (11th Cir. 2012) (citing *VanCook v. SEC*, 653 F.3d 130, 142 (2d Cir. 2011); *SEC v. Shanahan*, 646 F.3d 536, 547 (8th Cir. 2011)).

FOIA TREATMENT REQUESTED BY RESPONDENTS

2013 of Keystone's outside fixed-insurance business activity.   Subsequent to the 2013 examination, Mr. Laws had a series of telephonic conferences with members of LPL's supervisory team and legal and compliance departments, including among others, Robert Braden, Matt McNamara, and Nate Musterer.   During those telephonic conferences, Mr. Laws inquired as to whether LPL wished to routinely review the communications sent by Respondents to potential and actual customers, and invited LPL to do so.   LPL declined Mr. Law's suggestion, and stated that because Keystone's fixed-insurance business was an outside business activity, LPL was neither required nor interested in monitoring or maintaining Keystone's costumer communications, including any electronic communications sent or received from FEBC's e-mail domain.

Mr. Laws was supervised by Robert Braden, who testified that even after the 2013 examination, LPL never reviewed any of Keystone's marketing materials,[127] that LPL never discussed Keystone's marketing materials with Mr. Laws, and that Mr. Braden did not have any communications or discussion with Mr. Laws regarding the Staff's 2013 examination findings.

In 2013, Mr. Laws attempted to restructure Keystone's e-mail communications such that e-mails would no longer be sent from an FEBC domain, and would instead be sent through LPL's e-mail hosting server and domain.   LPL, however, refused.   Had LPL agreed to Mr. Law's request, all emails, whether securities related or not, would have gone through LPL's system. Aiding and abetting liability requires a showing that the defendant's substantial assistance proximately caused the primary violation.[128]   Here, Mr. Laws tried to remove any risk of a violation by using LPL's system for all email communications, but LPL declined this solution.

---

[127] *Id*. at 40.

[128] *S.E.C. v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 92 (2d Cir.1983)).

FOIA TREATMENT REQUESTED BY RESPONDENTS

## V.      RESPONDENTS DID NOT VIOLATE SECTION 15(a)(1) OF THE SECURITIES ACT.

Section 15(a)(1) makes it unlawful for any broker to "effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security ... unless such broker is registered" with the Commission.[129]   Here, each of the individual Respondents was at all applicable times duly licensed as a representative of a registered broker dealer –LPL.   Every securities transaction involving the Respondents was executed through LPL and under LPL's supervision.

There were simply no transactions executed away from LPL or through an unlicensed securities representative, and Respondents therefore did not violate Section 15(a).

## CONCLUSION

As set forth herein, the Respondents committed no securities law violations.  They did not engage in a scheme to defraud.  They did not engage in unregistered securities business. They did not aid and abet books and records violations.

We firmly believe that the dialogue to date has been productive in helping each side understand the other's perspective.  We believe further dialogue on these issues would provide more clarity as to our differing views as to whether any violations occurred, and we ask for an opportunity to meet with the Staff to continue the discussion about these issues.

---

[129] *SEC v. Radical Bunny, LLC,* No. CV 09-1560-PHX-SRB, 2011 WL 1458698 *7 (D. Ariz. April 12, 2011).

FOIA TREATMENT REQUESTED BY RESPONDENTS

EXHIBIT C



February 9, 2017

**VIA ELECTRONIC MAIL**

Matthew F. McNamara
Assistant Regional Director
Atlanta Regional Office
U.S. Securities and Exchange Commission
950 East Paces Ferry Road, N.E., Suite 900
Atlanta, GA 30326-1382

     Re:   **In the Matter of LPL Financial, LLC (A-03628)[1]**

Dear Mr. McNamara:

     We are writing in response to the Staff's recent questions regarding certain factual representations contained in the December 30, 2016 Wells Submission (the "Submission") made by Keystone Capital Partners, Inc. d/b/a Federal Employee Benefit Counselors ("Keystone"), Christopher Laws, Jonathan Dax Cooke, Danny Hood, and Brandon Long (collectively, the "Respondents").[2]

**The Disclosures Contained on the FEBC Website, in E-mail
Communications, and in the TSP Analysis**

     The Staff asked us to confirm whether certain disclosures referenced in the Submission were in effect during the period when Keystone solicited the customers discussed in the Submission. The Staff asked about three disclosures in particular. First, the Staff asked when the website disclosure referenced in the Submission on pages 16-17 and in footnote 26 were first published. Those disclosures first appeared in the spring of 2015, and therefore, the statement in the Submission that customers could have seen these disclosures in 2014 is inaccurate. This argument was proposed before the temporal disconnect was realized. As I mentioned during our recent call, that error was identified during the proofing process, but was inadvertently not corrected when revisions were made to the Submission. Respondents therefore should not be faulted for this mistake.

     The Staff next asked when the e-mail disclosure referenced in the Submission on page 20, footnote 50 was first available. Keystone has used that language since January 19, 2016. The Submission states that "[a] true and correct copy of an exemplar of the disclosure affixed to

---

[1] FOIA Confidential Treatment Requested By Keystone Capital Partners, Inc. D/B/A Federal Employee Benefit Counselors, Christopher Laws, Jonathan Dax Cooke, Danny Hood, and Brandon Long.

[2] This communication supplements the submission made by Respondents on December 30, 2016. Respondents respectfully request that this supplement be provided to the Commission along with Respondents' December 30, 2016 submission.

each e-mail sent from an FEBC e-mail domain is attached as Exhibit F."[3]  We did not intend with this statement for the Submission to suggest that that disclosure was utilized during 2013-14.  Rather, that statement was intended to describe the disclosure presently used on e-mail communications sent from an FEBC domain.  In addition, the sentence on which that footnote hangs was intended to describe the current disclosures, which is why it uses the present tense in stating that "Keystone expressly <u>discloses</u> on its website, marketing materials, and e-mail communications" (emphasis added).

Finally, the Staff asked when the TSP Analyses contained the disclosures referenced in the Submission on page 20, footnote 49, and on page 23, footnotes 59-60.  Again, these statements were intended to describe more recent disclosures contained in those materials.  Notwithstanding our intent, we now see how these statements could be read in their context as implying that such disclosures were included at the time of the events in question, and I apologize for any confusion in that regard as that certainly was not the intent.

With respect to each of the foregoing issues, as noted above, we have been asked to clarify which disclosures were in effect during the relevant period versus which disclosures were implemented at a later date.  To the extent these statements were incorrect or ambiguous, I take responsibility for not being clearer.  It certainly was not Respondents' fault.

### <u>The Documents Related to Rita Walston</u>

With respect to Ms. Walston, the Staff asked us to confirm the existence of an executed version of Ms. Walston's "Important Information Regarding Your Variable Annuity Purchase" form as referenced in the Submission at page 22, footnote 56.  We acknowledge that the document attached as Exhibit G to the Submission is not signed by Ms. Walston.  We believe no executed copy exists because she decided not to go forward with the transaction before signing.  We apologize for that unintentional oversight.

The Staff also asked us to confirm whether documents exist as stated in the Submission at p. 21 showing that Ms. Walston provided the Staff written certifications from her own records in which she expressly acknowledged that she received a copy of the prospectus.  We acknowledge that no such documents exist with respect to Ms. Walston.

Please note that these unintentional oversights in describing Ms. Walston's documents were drafting errors and not Respondents' fault.

### <u>Impact of the Errors Noted Above</u>

We have considered carefully whether the issues addressed above change in any way the arguments set forth in the Submission.  While we regret the foregoing inaccuracies within our submission, we firmly believe none of these issues was essential to or changes the reasons stated in the Submission explaining why Respondents should not be charged with securities law violations.  We are aware of no evidence showing or even suggesting Respondents ever intended

---

[3] <u>See</u> Submission, p. 20, n. 50.

2

to mislead any customer.  Indeed, the point of the foregoing references to disclaimers in the Submission was to illustrate how Respondents were always willing to disclose their lack of affiliation with the government.

When a question arose as to whether customers might incorrectly assume Keystone was affiliated with the government, Mr. Laws responded quickly and appropriately by implementing additional disclosures and procedures as described in the Submission.  Respondents never had any reason to suggest they were affiliated with the government.  Indeed, as early as December 2012, Respondents used marketing materials that stated they were not affiliated with the government.  Attached as Exhibit A is an example of a Marketing Survey that Respondents provided to potential customers in 2012 and 2013.  That Marketing Survey expressly discloses that Respondents are: "Not affiliated with any government agency."[4]  Although this disclosure was not included in every Marketing Survey used during the relevant period, the early use of that disclaimer provides clear evidence that there was no scheme to deceive customers into believing Keystone was in any way affiliated with the federal government.

Perhaps more importantly, as discussed in the Submission, upon first learning that a few customers had raised questions about whether Keystone was affiliated with the government, Mr. Laws immediately implemented procedures and disclosures to avoid any possibility of confusion.[5]   Keystone began including on the Marketing Survey a disclosure that stated: "Federal Employee Benefits Counselors is an independent organization and is not a government agency."[6]  In June of 2015, Keystone revised this disclosure to state:  "Federal Employee Benefits Counselors and Federal Employee Retirement Counselors, Inc. are independent organizations and are not government agencies or affiliated with the federal government."[7]  In December of 2015, Keystone utilized a further revised disclosure that provided: "Federal Employee Benefits Counselors (FEBC) and Federal Employee Retirement Counselors (FERC) are independent organizations and are not government agencies or affiliated with the federal government."[8]

Similarly, with respect to the TSP Analysis, Keystone began including the following disclosure in November 2014:  "Federal Employee Retirement Counselors is a dedicated independent organization of advanced retirement specialists providing guidance in the federal retirement system."[9]  The current iteration of the TSP Analysis includes a disclosure that states: "Federal Employee Retirement Counselors (FERC) is a dedicated independent organization of

---

[4] See Exhibit A (emphasis added) (Keystone002516).

[5] Submission, p. 34.

[6] See Exhibit B (emphasis added) (Keystone 002511).

[7] See Exhibit C.

[8] See Exhibit D (emphasis added); see also Exhibit E.

[9] See Exhibit F.

3

advanced retirement specialists providing guidance in the federal retirement system.  We are not federal employees or affiliated with the federal government."[10]

It is important to understand that, prior to someone bringing to Respondents' attention the possibility of confusion, they never had any reason to believe such confusion could exist.  This is because they knew that no customer could have purchased a variable annuity from them without first receiving numerous written communications indicating that the customer was purchasing a variable annuity, sold through LPL (not the federal government), underwritten by Jackson National Life Insurance (or another carrier), with one or more of Respondents acting as the registered representative for that transaction, and that the variable annuity came with certain surrender charges and other associated fees.  All of the information that the Staff has suggested was concealed by Respondents was contained in documents provided to each and every customer before a transaction could close.

But even before a transaction reached the point where all of these documents were provided to the customers, the TSP Analysis provided extensive information making clear how the product works.  In particular, the TSP Analysis makes clear that the product can involve market risk[11]  The TSP Analysis also explains that the product involves various funds, which can focus on a variety of equities or fixed income categories[12] Although the Staff faults Respondents for not using the words "variable annuity" in this presentation, we know of no legal requirement that they should have done so, and the presentation taken as a whole certainly communicates in general principles how the product works, which arguably is far more important than the name.  In any event, no sale occurred without each customer receiving all the documents and information they needed to know exactly what they were buying, what the costs were, and certainly that it was a "variable annuity."

As discussed above, we recognize that we do not have an executed copy of Ms. Walston's acknowledgment.  We believe no executed copy exists because she decided not to go forward with the transaction before signing that document.  This illustrates how the system worked and that it worked well.  The system and procedures provided every customer all the information they needed to know before proceeding with a transaction.  They could, as Ms. Walston did, decide not to go forward.  Not only did the system and procedures result in each customer receiving fulsome disclosures prior to execution, every customer also had a free look period, meaning that even after they signed all the documents, they could still change their minds for some period of time (typically ten days) and unwind the transaction.

Importantly, the reason for citing Exhibit G[13] was not to show that Ms. Walston signed the document, but rather to demonstrate that Respondents informed Ms. Walston (and every

---

[10] See Submission at Exhibit E. (emphasis added).

[11] See for example the graph on page 6 of Exhibit G hereto illustrating how the value of the investment fluctuates as the market does.

[12] See id. at p. 7.

[13] Ms. Walston's "Important Information Regarding Your Variable Annuity Purchase" form.

other customer) that she was purchasing a variable annuity.[14]  The Submission explained that, "[i]n addition to the prospectus, <u>other documents informed customers</u> they were buying a variable annuity.... Ms. Walston ... <u>received</u> from either LPL or Jackson National Life Insurance disclosure documents that unequivocally notified those customers" that they were purchasing a variable annuity."[15]  The information contained in those documents clearly explained that the customers were purchasing annuities, and provided other information relevant to the variable annuity purchase, including:

- o   The name of the financial advisor(s) credited for the variable annuity;

- o   The name of the insurance carrier issuing the variable annuity;

- o   The surrender charges associated with the variable annuity;

- o   The fees associated with the variable annuity;

- o   The riders associated with the variable annuity;

- o   The cost of those riders; and

- o   The date a copy of the prospectus had been delivered.

Again, the important point was not that Ms. Walston executed this acknowledgement, but rather that she (and every other customer) received all the information necessary to understand that she was purchasing a variable annuity, how it worked, and what its costs were.

In addition to the documents cited in our Submission, we attach as <u>Exhibit H</u> a form letter that Jackson National Life Insurance sent to each customer at the time of the transaction confirming that the customer received the sales materials, and inviting them to contact Jackson if they did not.

The evidence also demonstrates that Respondents believed each customer received a prospectus from at least one source if not multiple sources prior to the closing of their variable annuity transaction.  As we explained in the Submission, the fact that several customers did not have paper copies of a prospectus in their files is likely explained by either their signing up for electronic prospectus delivery with either Jackson National Life Insurance[16] or LPL,[17] or their own acknowledgements that they discarded documents related to their annuity transaction.[18]

---

[14] <u>See</u> Submission, p. 20.

[15] Submission, p. 22. (emphasis added).

[16]  <u>See</u> Submission at Exhibit N – Jackson National Life Insurance "Electronic Delivery Authorization Form."

[17] <u>See</u> Submission at Exhibit M – LPL "Electronic Prospectus Delivery" form.

[18] <u>See</u>, <u>e.g.</u>, Submission, p. 27, n. 82; Submission, p. 29, n. 93; Submission, p. 24, n. 67.

Administrative personnel within Keystone's office were responsible for sending on to customers the contract package, which would include the prospectus, but only if the customer did not request electronic delivery.  If the customer requested electronic delivery, the contract package would not include the prospectus.

To summarize, in determining whether it is appropriate to charge Respondents, the Commission should assess what Respondents knew and/or reasonably believed.  We believe the evidence shows without question that Respondents knew and/or reasonably believed that each customer received each of the following documents at the time of every executed sale transaction:

1.  The variable annuity contract (and a delivery receipt executed by the customer if he or she proceeded with the transaction);[19]

2.  A welcome letter from the carrier confirming receipt of the sales materials and offering a phone number to call if the customer had any questions;[20]

3.  A welcome letter from LPL confirming the customer's suitability information and offering a phone number to call if the customer had any questions;[21]

4.  A letter from TSP showing the disbursement of funds out of the TSP;[22]

5.  The prospectus;[23]

6.  A client acknowledgment form confirming that the customer received both the variable annuity contract and the prospectus;[24] and

7.  The LPL and carrier disclosure forms (which were executed if the customer proceeded with the transaction).[25]

Based upon the foregoing, there is no merit to the contention that Respondents misrepresented or concealed their governmental affiliation, or that Respondents were soliciting

---

[19] See, e.g., Exhibit I – Jackson National Insurance Delivery Receipt.

[20] See, e.g., Exhibit H – 2014 Jackson National Insurance "Welcome Letter."

[21] See, e.g., Exhibit J – LPL "Welcome Letter."

[22] See, e.g., Staff Investigation Exhibit No. 121 – Rita Walston TSP Withdrawal Confirmation letter.

[23] See http://securities-fraud-lawyer-blog.com/tag/financial-services/ (last accessed Feb. 8, 2017) (discussing LPL's settlement with FINRA and institution of the electronic prospectus delivery).

[24] See, e.g., Submission at Exhibit H – Jill Cross Jackson National Life Insurance "Client Acknowledgment Form."

[25] See, e.g., Submission at Exhibit I – Jill Cross LPL "Important Information Regarding Your Annuity Purchase" form.

the sale of variable annuities while disguising costs or other features of the product. Respondents' actions when viewed in the appropriate context discussed above do not evidence a scheme to defraud or a pattern and practice of intentional misrepresentations.  Instead, the evidence demonstrates that Respondents attempted to avoid being potentially confusing or misleading in their communications; they responded appropriately whenever concerns were raised about potential confusion; and they had every reason to believe their customers knew exactly what they were buying.

We recognize that this is a complicated case with complex facts, covering a long period of time, and with numerous relevant documents.  We still believe a meeting with the Staff will be productive.  At a minimum, further dialogue will help each side better understand the other's position, and perhaps we can reconcile any remaining misunderstandings.  Most importantly, we believe a meeting may help avoid Respondents being charged for violations they did not commit. We look forward to hearing from you.

Very truly yours,

*/s/ Matthew S. Johns*
Matthew S. Johns
Greenberg Traurig LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, Georgia 30305
Telephone: 678-553-2647
Email: johnsm@gtlaw.com

Cc: Stephen D. Councill

7